# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Docket No.: 2:17-CR-00197-001** |
| | : | |
| **RICHARD BOYLE** | : | |
| | : | |

# <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Respectfully submitted,

By: s/ *Nino V. Tinari*

NINO V. TINARI, ESQUIRE
Attorney Identification No.: 04296
1528 Walnut St, Suite 1212
Philadelphia, PA 19102
T: 215-790-4010/F: 215-790-4002

## INDEX TO DEFENDANT'S SENTENCING MEMORANDUM
## AND SUPPORTING DOCUMENTS

A. **OFFENSES AND PENALTIES**

B. **STATEMENT OF LAW: SENTENCING CONSIDERATIONS**

C. **IMPOSITION OF SENTENCE PURSUANT TO 18 U.S.C. § 3553 (A): FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE AND REASONS FOR DOWNWARD VARIANCE AND/OR DOWNWARD DEPARTURE**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Docket No.: 2:17-CR-00197-001** |
| | : | |
| **RICHARD BOYLE** | : | |
| | : | |

## A.   OFFENSES AND PENALTIES

### COUNTS 1, 3, 4, 6, 8, 10, 12, 14, 16, 18, 20:
Bank Robbery
18 U.S.C. § 2113(a)
Not more than 20 years of imprisonment/$250,000 fine
(Class C felonies)

### COUNT 2:
Using and carrying a firearm during and in relation to a crime of violence
18 U.S.C. § 924(c)(1)(A)(i)
5 years to life imprisonment/$250,000 fine
(Class A felonies)

### COUNTS 5, 7, 9, 11, 13, 15, 17, 21:
Brandishing, using, and carrying a firearm during and in relation to a crime of violence
18 U.S.C. § 924(c)(1)(A)(ii)
7 years to life imprisonment/$250,000 fine
(Class A felonies)

### COUNTS 22-31:
Money laundering
18 U.S.C. § 1956
Not more than 20 years imprisonment/$500,000 fine
(Class C felonies)

# B. STATEMENT OF THE LAW: SENTENCING CONSIDERATIONS

## PROCEDURE OF THE SENTENCING COURT

### a) *United States v. Booker*

Following the Supreme Court's decision *in United States v. Booker*, 543 U.S. 220 (2005),

sentencing courts should engage in a three-step approach to federal sentencing.

First, the court should apply the sentencing guidelines to establish the sentencing

guideline range. *Gall v. United States*, 552 U.S. 38 (2007) (stating that the district court should

begin all sentencing proceedings by correctly calculating the applicable guideline range, and that

"to secure nationwide consistency, the Guidelines should be the starting point and the initial

benchmark").

Second, the court should determine whether a departure is consistent with the guidelines.

See, e.g., *United States v. McBride*, 434 F.3d 470 (6th Cir. 2006) (holding that guideline

departures are still a relevant consideration for determining the appropriate guideline sentence);

*United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (stating that "the application of the

guidelines is not complete until the departures, if any, that are warranted are appropriately

considered"); see also *United States v. Lofink*, 564 F.3d 232 (3d Cir. 2009) (holding that a district

court's failure to rule on the defendant's departure arguments constitutes procedural error). But

see *United States v. Johnson*, 427 F.3d 423 (7th Cir. 2005) (stating that the defendant's "framing

of the issue as one about 'departures' has been rendered obsolete by our recent decisions

applying Booker," and holding that "[i]t is now clear that after Booker what is at stake is the

reasonableness of the sentence, not the correctness of the 'departures' as measured against pre-

Booker decisions that cabined the discretion of sentencing courts to depart from guidelines that

were then mandatory*"); United States v. Mohammed*, 459 F.3d 979 (9th Cir. 2006) (holding that, in light of *Booker*, it would "treat such so-called departures as an exercise of post-*Booker* discretion to sentence a defendant outside of the applicable guidelines range" and subject it to a "unitary review for reasonableness, no matter how the district court styles its sentencing decision"); see also *United States v. Brown*, 578 F.3d 221 (3d Cir. 2006) (vacating and remanding where district court failed to distinguish whether above guideline sentence was product of a departure or a variance); *United States v. Miller*, 479 F.3d 984 (8th Cir. 2007) (holding that conflating departure considerations and the variance analysis can be harmless error where the ultimate sentence is not unreasonable).

Third, the court should determine whether a variance (a sentence outside the advisory guideline system) is warranted under the authority of 18 U.S.C. § 3553(a).

### a. GENERAL PRINCIPAL

A court may impose a sentence outside the properly calculated sentencing guideline range through either a departure or a variance.

A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a).1.

A "variance" outside the guideline range provided for in the Guidelines Manual should occur after consideration of all relevant departure provisions. Courts have held that variances are

not subject to the guideline analysis for departures. In some situations, a prohibited ground for departure may be a valid basis for a variance. Variances are not subject to notice requirements applicable to departures. A court may grant a departure and a variance in the same sentence (e.g., a departure for substantial assistance and a variance for the defendant's history and characteristics).

### b) The impact of the Supreme Court's Decision in Gall v. United States

In light of the United States Supreme Court's decision in *Gall v. United States,* 128 S.Ct. 586,552 U.S (2007), *Gall* reinforces the district court's broad discretion in selecting a sentence outside the Guidelines range, whether by applying traditional Guidelines departure or by granting a variance under 18 U.S.C. §3553 (a). *Gall* forbids an appellate court from substituting its own judgment for that of the district judge, so long as the district judge explains his sentence with reasons supported by the record and tied to the considerations of §3553(a).

### i. The *Gall* Case

In *Gall,* the district court sentenced Brian Gall, a participant in an ecstasy distribution conspiracy, to a term of probation for thirty-six months. This was a downward variance from a Guideline range of thirty to thirty-seven months imprisonment. *Id* at 591. Gall had withdrawn from the conspiracy a few months after he had joined it, ceased selling or using illegal drugs of any kind, graduated from college, started a career, and otherwise lived a reputable life for years preceding his sentence. *Id.* The sentencing court received a "flood" of letters in support of Gall from members of the community. *Id* at 593.

Applying the factors thus enumerated in §3553(a), the district judge determined that a sentence of probation was "Sufficient, but not greater than necessary to serve the purposes of sentencing." *Id.* This decision was made in light of Gall's post-offense conduct, the support

offered by his family and friends, his lack of any criminal history, and his youthful age at the time of the offense conduct. *Id.* The district judge further justified said sentence in that a sentence of probation would reflect the seriousness of Gall's offense, while a prison term would deprive society of Gall's contributions despite evidence that Gall understood the consequences of his criminal conduct, posed little risk of recidivism, and would not be a danger to society. *Id.*

The Circuit Court reversed and remanded, holding that the variance granted to Gall was so substantial that it needed to be supported by extraordinary circumstances. *Id* at 594. In a 7-2 decision the Supreme Court reversed. The Court rejected the Eighth circuit's rule that a so-called "extraordinary" variance from the Guidelines must be justified by "extraordinary" circumstances. *Id* at 595. The Court also discredited the Eighth Circuit's rule that *any* non-prison sentence amounts to a "100% departure" from a Guidelines sentence, because that approach "gives no weight to the 'substantial restriction of freedom' involved in a term of supervised release or probation." *Id.* at 595-596. As such, *Gall* did not alter, but in fact reiterate the process a sentencing judge must follow in the post-*Booker* era. The judge must begin by correctly calculating the applicable Guideline range, then hears argument from the parties as to the sentence they deem appropriate and proceeds to consider all of the §3553(a) factors. *Id.* at 596. A judge is *not* to presume that the Guidelines range is reasonable, but must make an "individualized assessment based on the facts presented." *Id.* at 597. In order to allow for meaningful review, the judge must adequately explain the chosen sentence. *Id.*

The *Gall* Court subsequently addressed the Circuit's review of the District Judge's §3553(a) analysis, concluding:

> The court of appeals gave virtually no deference to the District Court's decision that the §3553(a) factors justified a significant variance in this case, Although the Court of Appeals correctly stated that the appropriate standard of review was abuse of discretion,

it engaged in an analysis that more closely resembled de novo review of facts presented and determined that, in its view, the degree of variance was not warranted.

*Id.* At 600. The Supreme Court held that the district judge properly considered the relevant factors in Gall's case, consisting of Gall's age, his early withdrawal from the conspiracy, and his efforts to rehabilitate himself as supporting a variance under several §3553 (a) factors. *Id.* At 600-01. The Eighth Circuit's view that the district judge did not give enough weight to the "seriousness of the offense," and the need to avoid unwarranted sentencing disparities, was belied by the record. *Id.* at 599.

As such, *Gall* re-emphasized that appellate courts have a limited role in reviewing criminal sentences. While the aforementioned Circuit Court clearly disagreed with the district judge's §3553 (a) analysis and his ultimate sentence, the Supreme Court underscored that "it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable." *Id.* at 601-02. Instead, a Court of Appeals must defer to a district judge's, "reasoned and reasonable decision that the §3553 (a) factors, on the whole, justify the sentence."

    ii.     Applying *Gall*

*Gall* requires a more deferential standard than pre-*Gall* findings under U.S.S.G §5H1.4 as they relate to non-Guideline sentences. It thus permits lower Courts to set any reasonable sentence as long as they explain their reasoning.

In <u>Pepper v. United States</u>, --- S. Ct. ---, 2011 WL 709543 (March 2, 2011), the Supreme Court again emphasized that the guiding principle of federal sentencing is that "the punishment should fit the offender and not merely the crime".

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in

the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

--- S. Ct. ---, 2011 WL 709543 at *8 (quoting Koon v. United States, 518 U.S. 81, 113 (1996); Williams v. New York, 337 U.S. 241, 247 (1949)) (other internal quotation marks and citations omitted). Sentencing Courts consequently must "consider the widest possible breadth of information about a defendant" to ensure "that the punishment will not suit merely the offense but the individual defendant." Id. (quoting Wassman v. United States, 468 U.S. 559, 564 (1984)). See also, 18 U.S.C. §3661 (providing that "no limitation shall be placed on the information concerning the background, character, and conduct" of a defendant which may be considered "for the purpose of imposing an appropriate sentence.").

To accomplish this aim, the Court must follow the steps prescribed by the Third Circuit in United States v. Merced, 603 F.3d 203 (3d Cir. 2010):

(1)   [C]orrectly calculate the defendant's Guideline range[;]

(2)   [R]ule on any motions for departures[; and].

(3)   After giving both parties an opportunity argue for whatever sentence they deem appropriate, . . . exercise[ ] its discretion through meaningful consideration to the §3553(a) factors before deciding on a sentence. [1]

Merced, 603 F.3d at 215 (internal citations and quotation marks omitted) (paragraphing altered) (quoting United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006); Gall v. United States, 552 U.S. 38, 49 (2007); and, United States v. Cooper, 437 F.3D 324, 329 (3d Cir. 2006)). In arriving

---

[1] The sentencing factors set forth in §3553(a) include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentence available; (3) the Guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range; (4) the need to avoid unwarranted sentencing disparity; and, (5) the need to provide restitution where pllicable. 18 U.S.C. §3553(a)(1), (a)(3), (a)(5)-(7).

at an ultimate sentence, the sentencing Court may not treat a Guidelines sentence as inherently superior to, or more reasonable than, a non-Guidelines sentence. See Nelson v. United States, --- U.S. ---, 129 S. Ct. 890, 891 (2009) ("The Guidelines are not only not mandatory on sentencing Courts; they are not to be presumed reasonable.") [emphasis in original]; Gall v. United States, 552 U.S. 38, 50 (2007) (sentencing courts "may not presume that the Guidelines range is reasonable."). Nor can it refuse to consider non-Guidelines sentences in ordinary cases. See Pepper, --- S. Ct. ---, 2011 WL 709543 at *13 (citing Gall, 552 U.S. at 47).

At the third stage of sentencing, the Court may, pursuant to the goals of sentencing set forth at 18 U.S.C. §3553(a), vary from the Guidelines because of case-specific considerations, policy reasons, or both. See Spears v. United States, --- U.S. ---, 129 S. Ct. 840, 843 (2009). As the Supreme Court has said again and again since its decision in Booker, judges have the power to impose sentences that are sufficient, but not greater than necessary to satisfy the statutory purposes of sentencing, to consider all the characteristics of the offender and circumstances of the offense, and to reject advisory guidelines that are not based on national sentencing data and empirical research. See United States v. Booker, 543 U.S. 220 (2005); Rita v. United States, 551 U.S. 338 (2007); Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Spears v. United States, 129 S. Ct. 840 (2009); Nelson v. United States, 129 S. Ct. 890 (2009). See also 18 U.S.C. §3553(a); United States v. Tomko, 562 F.3d 558, 560-561 (3d Cir. 2009) (en banc).[2] Indeed, district Court's exercise of their independent discretion furthers the process of "continuous evolution" contemplated by the Guidelines themselves. Rita, 551 U.S. at 350 (2007). Moreover, the Court is free to disagree with the guidelines on policy grounds alone – even where those guidelines were created pursuant to Congressional directive. See Merced, 603 F.3d at 218. See also Pepper, 2011 WL 709543 at *16 ("[O]ur post-Booker

decisions make clear that a district Court may in appropriate cases impose a non-Guidelines sentence based on disagreement with the Commission's views.") In short, in arriving at a final sentence, the Court should consider the "fullest information possible concerning the defendant's life and characteristics," Pepper, --- S. Ct. ---, 2011 WL 709543 at *8 (internal quotation marks and citations omitted), and impose the sentence that is minimally necessary to fulfill the goals of sentencing for Mr. Boyle. *Id.* At 600. The Supreme Court held that the district judge properly considered the relevant factors in Gall's case, consisting of Gall's age, his early withdrawal from the conspiracy, and his efforts to rehabilitate himself as supporting a variance under several §3553 (a) factors. *Id.* At 600-01. The Eighth Circuit's view that the district judge did not give enough weight to the "seriousness of the offense," and the need to avoid unwarranted sentencing disparities, was belied by the record. *Id.* at 599.

As such, *Gall* re-emphasized that appellate courts have a limited role in reviewing criminal sentences. While the aforementioned Circuit Court clearly disagreed with the district judge's §3553 (a) analysis and his ultimate sentence, the Supreme Court underscored that "it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable." *Id.* at 601-02. Instead, a Court of Appeals must defer to a district judge's, "reasoned and reasonable decision that the §3553 (a) factors, on the whole, justify the sentence."

## C.     <u>Imposition of Sentence</u>

## 18 U.S.C. §3553 (A)

## Factors To Be Considered In Imposing a Sentence

# *3553(a) 1.*

# *Nature and Circumstances of the Offense and History and Characteristics of the Defendant;*

### <u>Nature and Circumstances of the Offense</u>:

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005).

Richard Boyle has been alleged to have committed eleven bank robberies from the period of 2012 to 2016, while on parole in Pennsylvania for prior bank robberies. He took over the

banks by brandishing a firearm and forcing bank employees to open the vaults and ATM machines enabling him to steal $495,686.

## Characteristics of the Defendant:

Richard Boyle was born in Philadelphia, Pennsylvania on September 10, 1959 to Joan Reardon and Francis (Frank) J. Boyle. His parent also had to other children, Eve Boyle and Nan Boyle.

As a child, Richard Boyle lived with his parents and sisters in Philadelphia, as well as Tucson, Arizona, and in south Florida. Mr. Boyle describes his childhood as chaotic and traumatic, suffering physical abuse at the hands of his father. He indicates that he ran away from home multiple times, was sent to group homes, and would run away again.

When he became a teenager, Boyle began living on his own in Miami, Florida and eventually joined the Navy in 1977. His was generally discharged in 1980 due to mental health reasons. Shortly after his discharge, he returned to south Florida and began working in hospital operating rooms as a surgical assistant. His time working in hospitals was cut short after he rear-ended a police vehicle while driving and smoking. He struggled to regain himself after that incident and eventually moved to the Everglades.

In 1986, Boyle married Teresa Manning and moved to Salt Lake City, Utah where he found work as a surgical assistant. His marriage to Teresa was tumultuous due to her mental health problems, history of sexual abuse, and addictions to alcohol and drugs. Together they had four children, Dillon Boyle, Liam Boyle, Abigail Boyle, and Haley Coolbaugh. Mr. Boyle has not had contact with his sons since 2016, whereas Abigail and Haley both visit him at the Federal Detention Center.

See Paragraphs 157 through 167 of the Presentence Investigation Report.

## Physical Condition of Defendant:

Please see paragraphs 169-172 of the Presentence Investigation Report, as well as paragraphs 173 to 178.

## Substance Abuse:

Please see paragraphs 179-180 of the Presentence Investigation Report.

## Education:

Please see paragraphs 181-182 of the Presentence Investigation Report.

**Employment:**

Please see paragraphs 184-190 of the Presentence Investigation Report.

# *3553(a)(2)(A)*

# *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

The Court must consider §3553 (a)(2)(A) in fashioning the appropriate sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. In this individual case, a prison sentence with a significant variance form the guidelines and mandatory minimum statutes along with other strict requirements given its' uniqueness and atypical circumstances; would never be viewed as "unreasonable" applying an abuse-of discretion standard as per *Gall*.

# *3553(a)(2)(D)*

## *To provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner:*

The defendant has attended mental health counseling in the past. However, it is believed the Defendant would continue to benefit from mental health counseling as part of any sentence imposed herein as it appears the state of his mental health has directly impacted Richard Boyle and is directly related to his involvement in the instant offense.

# *3553(a)(4)(A)and(B)*
# *And 3553 (a)(5)*

## *The kinds of sentence and the sentencing range established by the guidelines:*

The Probation Officer has calculated an advisory guideline range of 151-188 months, resulting from an adjusted offense level of 32 and Criminal History Category III. The presentence officer also calculated the consecutive sentence pursuant to 924(c) bringing the total effective guideline range to 967 – 1004 months. The guideline range offers no useful advice in determining the reasonable sentence.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELWARE**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Docket No.: 2:17-CR-00197-001** |
| **RICHARD BOYLE** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served this day via

first-class mail and/or hand delivery upon the following:

Honorable Gene E. K. Pratter
601 Market Street
Philadelphia, PA 19107


Robert Livermore
U.S. Attorney
Chestnut Street
Philadelphia, PA 19107


DATE:   December 20, 2019          By: s/ *Nino V. Tinari*

NINO V. TINARI, ESQUIRE
Attorney for Defendant
1528 Walnut St, Suite 1212
Philadelphia, PA 19102
T: 215-790-4010/ F: 215-790-4002
Email: nino@ntinarilaw.com

**Exhibit 1**

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–431

## UNITED STATES, PETITIONER *v.* MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

Today we apply these principles to 18 U. S. C. §924(c). That statute threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes. But *which* other federal crimes? The statute's residual clause points to those felonies "that by [their] nature, involv[e] a substantial risk that physical force

against the person or property of another may be used in the course of committing the offense." §924(c)(3)(B). Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague. So today the government attempts a new and alternative reading designed to save the residual clause. But this reading, it turns out, cannot be squared with the statute's text, context, and history. Were we to adopt it, we would be effectively stepping outside our role as judges and writing a new law rather than applying the one Congress adopted.

## I

After Maurice Davis and Andre Glover committed a string of gas station robberies in Texas, a federal prosecutor charged both men with multiple counts of robbery affecting interstate commerce in violation of the Hobbs Act, 18 U. S. C. §1951(a), and one count of conspiracy to commit Hobbs Act robbery. The prosecutor also charged Mr. Davis with being a felon in possession of a firearm. In the end, a jury acquitted Mr. Davis of one robbery charge and otherwise found the men guilty on all counts. And these convictions, none of which are challenged here, authorized the court to impose prison sentences of up to 70 years for Mr. Davis and up to 100 years for Mr. Glover.

But that was not all. This appeal concerns *additional* charges the government pursued against the men under §924(c). That statute authorizes heightened criminal penalties for using or carrying a firearm "during and in relation to," or possessing a firearm "in furtherance of," any federal "crime of violence or drug trafficking crime." §924(c)(1)(A). The statute proceeds to define the term "crime of violence" in two subparts—the first known as the elements clause, and the second the residual clause.

According to §924(c)(3), a crime of violence is "an offense that is a felony" and

> "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> "(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Violators of §924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties—for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of §924(c) carry a minimum sentence of 25 years.[1]

At trial, the government argued that Mr. Davis and Mr. Glover had each committed two separate §924(c) violations by brandishing a short-barreled shotgun in connection with their crimes. Here, too, the jury agreed. These convictions yielded a mandatory minimum sentence for each man of 35 years, which had to run consecutively to their other sentences. Adding the §924(c) mandatory minimums to its discretionary sentences for their other crimes, the district court ultimately sentenced Mr. Glover to more

---

[1] When this case was tried, a defendant convicted of two §924(c) violations in a single prosecution faced a 25-year minimum for the second violation. See *Deal* v. *United States*, 508 U. S. 129, 132 (1993); §1(a)(1), 112 Stat. 3469. In 2018, Congress changed the law so that, going forward, only a second §924(c) violation committed "after a prior [§924(c)] conviction . . . has become final" will trigger the 25-year minimum. Pub. L. 115–391, §403(a), 132 Stat. 5221.

than 41 years in prison and Mr. Davis to more than 50 years.

On appeal, both defendants argued that §924(c)'s residual clause is unconstitutionally vague. At first, the Fifth Circuit rejected the argument. *United States* v. *Davis*, 677 Fed. Appx. 933, 936 (2017) (*per curiam*). But after we vacated its judgment and remanded for further consideration in light of our decision in *Sessions* v. *Dimaya*, 584 U. S. ___ (2018), striking down a different, almost identically worded statute, the court reversed course and held §924(c)(3)(B) unconstitutional. 903 F. 3d 483, 486 (2018) (*per curiam*). It then held that Mr. Davis's and Mr. Glover's convictions on one of the two §924(c) counts, the one that charged *robbery* as a predicate crime of violence, could be sustained under the elements clause. But it held that the other count, which charged *conspiracy* as a predicate crime of violence, depended on the residual clause; and so it vacated the men's convictions and sentences on that count.

Because the Fifth Circuit's ruling deepened a dispute among the lower courts about the constitutionality of §924(c)'s residual clause, we granted certiorari to resolve the question. 586 U. S. ___ (2018).[2]

## II

Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. See *Dimaya*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 4–5); *id.,* at ___–___

---

[2] Compare *United States* v. *Simms,* 914 F. 3d 229, 236–246 (CA4 2019) (en banc), *United States* v. *Salas,* 889 F. 3d 681, 685–686 (CA10 2018), and *United States* v. *Eshetu,* 898 F. 3d 36, 37–38 (CADC 2018) (holding that §924(c)(3)(B) is vague), with *United States* v. *Douglas,* 907 F. 3d 1, 11–16 (CA1 2018), *Ovalles* v. *United States,* 905 F. 3d 1231, 1240–1252 (CA11 2018) (en banc), and *United States* v. *Barrett,* 903 F. 3d 166, 178–184 (CA2 2018) (taking the opposite view).

(GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 2–9). Vague laws contravene the "first essential of due process of law" that statutes must give people "of common intelligence" fair notice of what the law demands of them. *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926); see *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914). Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to "make an act a crime." *United States* v. *Hudson*, 7 Cranch 32, 34 (1812). Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide. See *Kolender* v. *Lawson*, 461 U. S. 352, 357–358, and n. 7 (1983); *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–91 (1921); *United States* v. *Reese*, 92 U. S. 214, 221 (1876).

In recent years, this Court has applied these principles to two statutes that bear more than a passing resemblance to §924(c)(3)(B)'s residual clause. In *Johnson* v. *United States*, 576 U. S. ___ (2015), the Court addressed the residual clause of the Armed Career Criminal Act (ACCA), which defined a "violent felony" to include offenses that presented a "serious potential risk of physical injury to another." §924(e)(2)(B)(ii). The ACCA's residual clause required judges to use a form of what we've called the "categorical approach" to determine whether an offense qualified as a violent felony. Following the categorical approach, judges had to disregard how the defendant actually committed his crime. Instead, they were required to imagine the idealized "'ordinary case'" of the defendant's crime and then guess whether a "'serious potential risk of physical injury to another'" would attend its commission. *Id.*, at ___ (slip op., at 4). *Johnson* held this

judicial inquiry produced "more unpredictability and arbitrariness" when it comes to specifying unlawful conduct than the Constitution allows. *Id.,* at ___–___ (slip op., at 5–6).

Next, in *Sessions* v. *Dimaya,* we considered the residual clause of 18 U. S. C. §16, which defines a "crime of violence" for purposes of many federal statutes. Like §924(c)(3), §16 contains an elements clause and a residual clause. The only difference is that §16's elements clause, unlike §924(c)(3)'s elements clause, isn't limited to felonies; but there's no material difference in the language or scope of the statutes' residual clauses.[3] As with the ACCA, our precedent under §16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence. *Dimaya,* 584 U. S., at ___–___ (slip op., at 2–3); see *Leocal* v. *Ashcroft,* 543 U. S. 1, 7, 10 (2004). And, again as with the ACCA, we held that §16's residual clause was unconstitutionally vague because it required courts "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk." *Dimaya,* 584 U. S., at ___ (slip op., at 11) (internal quotation marks omitted).

What do *Johnson* and *Dimaya* have to say about the statute before us? Those decisions teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." But does §924(c)(3)(B) require that sort of inquiry? The government and lower courts

---

[3] Section 16 provides that the term "crime of violence" means "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

have long thought so. For years, almost everyone under-
stood §924(c)(3)(B) to require exactly the same categorical
approach that this Court found problematic in the residual
clauses of the ACCA and §16.[4] Today, the government
acknowledges that, if this understanding is correct, then
§924(c)(3)(B) must be held unconstitutional too.

But the government thinks it has now found a way
around the problem. In the aftermath of our decisions
holding the residual clauses of the ACCA and §16(b) un-
constitutionally vague, the government "abandon[ed] its
longstanding position" that §924(c)(3)(B) requires a cate-
gorical analysis and began urging lower courts to "adopt a
new 'case specific' method" that would look to "the 'de-
fendant's actual conduct' in the predicate offense." 903
F. 3d, at 485. Now, the government tries the same strat-
egy in this Court, asking us to abandon the traditional
categorical approach and hold that the statute actually
commands the government's new case-specific approach.
So, while the consequences in this case may be of constitu-
tional dimension, the real question before us turns out to
be one of pure statutory interpretation.

In approaching the parties' dispute over the statute's
meaning, we begin by acknowledging that the government

---

[4]See, *e.g.*, *United States* v. *Acosta*, 470 F. 3d 132, 134–135 (CA2
2006); *United States* v. *Butler*, 496 Fed. Appx. 158, 161 (CA3 2012);
*United States* v. *Fuertes*, 805 F. 3d 485, 498 (CA4 2015); *United States*
v. *Williams*, 343 F. 3d 423, 431 (CA5 2003); *Evans* v. *Zych*, 644 F. 3d
447, 453 (CA6 2011); *United States* v. *Jackson*, 865 F. 3d 946, 952 (CA7
2017), vacated and remanded, 584 U. S. \_\_\_ (2018); *United States* v.
*Moore*, 38 F. 3d 977, 979–980 (CA8 1994); *United States* v. *Amparo*, 68
F. 3d 1222, 1225–1226 (CA9 1995); *United States* v. *Munro*, 394 F. 3d
865, 870 (CA10 2005); *United States* v. *McGuire*, 706 F. 3d 1333, 1336–
1337 (CA11 2013); *United States* v. *Kennedy*, 133 F. 3d 53, 56 (CADC
1998); see also *Ovalles* v. *United States*, 905 F. 3d 1231, 1295 (CA11
2018) (en banc) (J. Pryor, J., dissenting) ("For years, and even after
*Johnson*, the government consistently has urged that we apply a
categorical approach to §924(c)").

is right about at least two things. First, a case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*. In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's "'real-world conduct'" created a substantial risk of physical violence. *Dimaya*, 584 U. S., at ___–___ (slip op., at 10–11); see *Johnson*, 576 U. S., at ___, ___ (slip op., at 6, 12). Second, a case-specific approach wouldn't yield the same practical and Sixth Amendment complications under §924(c) that it would have under the ACCA or §16. Those other statutes, in at least some of their applications, required a *judge* to determine whether a defendant's *prior conviction* was for a "crime of violence" or "violent felony." In that context, a case-specific approach would have entailed "reconstruct[ing], long after the original conviction, the conduct underlying that conviction." *Id.*, at ___ (slip op., at 13). And having a judge, not a jury, make findings about that underlying conduct would have "raise[d] serious Sixth Amendment concerns." *Descamps* v. *United States*, 570 U. S. 254, 269–270 (2013). By contrast, a §924(c) prosecution focuses on the conduct with which the defendant is *currently charged*. The government already has to prove to a jury that the defendant committed all the acts necessary to punish him for the underlying crime of violence or drug trafficking crime. So it wouldn't be that difficult to ask the jury to make an additional finding about whether the defendant's conduct also created a substantial risk that force would be used.

But all this just tells us that it might have been a good idea for Congress to have written a residual clause for §924(c) using a case-specific approach. It doesn't tell us whether Congress actually wrote such a clause. To answer *that* question, we need to examine the statute's text, context, and history. And when we do that, it becomes clear that the statute simply cannot support the govern-

ment's newly minted case-specific theory.

### III
#### A

Right out of the gate, the government faces a challenge. This Court, in a unanimous opinion, has already read the nearly identical language of 18 U. S. C. §16(b) to mandate a categorical approach. And, importantly, the Court did so without so much as mentioning the practical and constitutional concerns described above. Instead, the Court got there based entirely on the text. In *Leocal*, the Court wrote:

> "In determining whether petitioner's conviction falls within the ambit of §16, the statute directs our focus to the 'offense' of conviction. See §16(a) (defining a crime of violence as '*an offense* that has *as an element* the use . . . of physical force against the person or property of another' (emphasis added)); §16(b) (defining the term as '*any other offense* that is a felony and that, *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)). This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." 543 U. S., at 7.

*Leocal* went on to suggest that burglary would always be a crime of violence under §16(b) "because burglary, *by its nature*, involves a substantial risk that the burglar will use force against a victim in completing the crime," regardless of how any *particular* burglar might act on a specific occasion. *Id.*, at 10 (emphasis added); see also *Dimaya*, 584 U. S., at ___ (slip op., at 14) (plurality opinion) (reaffirming that "§16(b)'s text . . . demands a categorical approach"). And what was true of §16(b) seems to us

at least as true of §924(c)(3)(B): It's not even close; the statutory text commands the categorical approach.

Consider the word "offense." It's true that "in ordinary speech," this word can carry at least two possible meanings. It can refer to "a generic crime, say, the crime of fraud or theft in general," or it can refer to "the specific acts in which an offender engaged on a specific occasion." *Nijhawan* v. *Holder,* 557 U. S. 29, 33–34 (2009). But the word "offense" appears just once in §924(c)(3), in the statute's prefatory language. And everyone agrees that, in connection with the elements clause, the term "offense" carries the first, "generic" meaning. Cf. *id.,* at 36 (similar language of the ACCA's elements clause "refers directly to generic crimes"). So reading this statute most naturally, we would expect "offense" to retain that same meaning in connection with the residual clause. After all, "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc.* v. *United States ex rel. Hunt,* 587 U. S. ___, ___ (2019) (slip op., at 5).

To prevail, the government admits it must persuade us that the singular term "offense" bears a split personality in §924(c), carrying the "generic" meaning in connection with the elements clause but then taking on the "specific act" meaning in connection with the residual clause. And, the government suggests, this isn't quite as implausible as it may sound; sometimes the term "offense" *can* carry both meanings simultaneously. To illustrate its point, the government posits a statute defining a "youthful gun crime" as "an offense that has as an element the use of a gun and is committed by someone under the age of 21." Tr. of Oral Arg. 16. This statute, the government suggests, would leave us little choice but to understand the single word "offense" as encompassing both the generic crime and the manner of its commission on a specific occasion. To which we say: Fair enough. It's *possible* for

surrounding text to make clear that "offense" carries a double meaning. But absent evidence to the contrary, we presume the term is being used consistently. And nothing in §924(c)(3)(B) comes close to rebutting that presumption.

Just the opposite. The language of the residual clause itself reinforces the conclusion that the term "offense" carries the same "generic" meaning throughout the statute. Section 924(c)(3)(B), just like §16(b), speaks of an offense that, "by its nature," involves a certain type of risk. And that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct. As both sides agree, the "nature" of a thing typically denotes its "'normal and characteristic quality,'" *Dimaya*, 584 U. S., at ___ (slip op., at 14) (quoting Webster's Third New International Dictionary 1507 (2002)), or its "'basic or inherent features,'" *United States* v. *Barrett*, 903 F. 3d 166, 182 (CA2 2018) (quoting Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed. 2010)). So in plain English, when we speak of the nature of an offense, we're talking about "what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion." *Dimaya*, 584 U. S., at ___ (slip op., at 14); see *Leocal*, 543 U. S., at 7 (contrasting the "nature of the offense" with "the particular facts [of] petitioner's crime").[5]

Once again, the government asks us to overlook this obvious reading of the text in favor of a strained one. It suggests that the statute might be referring to the "na-

---

[5] The government's own regulations reflect this understanding of the ordinary meaning of "by its nature." A Department of Justice regulation provides that an inmate is not eligible for early release if he was convicted of an offense "that, by its nature *or conduct,* presents a serious potential risk of physical force." 28 CFR §550.55(b)(5)(iii) (2017) (emphasis added); see *Bush* v. *Pitzer*, 133 F. 3d 455, 458 (CA7 1997) (denying early release because "[c]onspiracy does not by its 'nature' present a serious risk; but Bush's 'conduct' did so").

ture" of the defendant's conduct on a particular occasion. But while this reading may be linguistically feasible, we struggle to see why, if it had intended this meaning, Congress would have used the phrase "by its nature" at all. The government suggests that "by its nature" keeps the focus on the offender's *conduct* and excludes evidence about his *personality,* such as whether he has violent tendencies. But even without the words "by its nature," nothing in the statute remotely suggests that courts are allowed to consider character evidence—a type of evidence usually off-limits during the guilt phase of a criminal trial. Cf. Fed. Rule Evid. 404.

### B

Things become clearer yet when we consider §924(c)(3)(B)'s role in the broader context of the federal criminal code. As we've explained, the language of §924(c)(3)(B) is almost identical to the language of §16(b), which this Court has read to mandate a categorical approach. And we normally presume that the same language in related statutes carries a consistent meaning. See, *e.g., Sullivan* v. *Stroop,* 496 U. S. 478, 484 (1990).

This case perfectly illustrates why we do that. There are dozens of federal statutes that use the phrase "crime of violence" to refer to presently charged conduct rather than a past conviction. Some of those statutes cross-reference the definition of "crime of violence" in §924(c)(3), while others are governed by the virtually identical definition in §16. The choice appears completely random. Reading the similar language in §924(c)(3)(B) and §16(b) similarly yields sensibly congruent applications across all these other statutes. But if we accepted the government's invitation to reinterpret §924(c)(3)(B) as alone endorsing a case-specific approach, we would produce a series of seemingly inexplicable results.

Take just a few examples. If the government were right,

Congress would have mandated the case-specific approach in a prosecution for providing explosives to facilitate a crime of violence, 18 U. S. C. §844(*o*), but the (now-invalidated) categorical approach in a prosecution for providing *information about* explosives to facilitate a crime of violence, §842(p)(2). It would have mandated the case-specific approach in a prosecution for using false identification documents in connection with a crime of violence, §1028(b)(3)(B), but the categorical approach in a prosecution for using confidential phone records in connection with a crime of violence, §1039(e)(1). It would have mandated the case-specific approach in a prosecution for giving someone a firearm to use in a crime of violence, §924(h), but the categorical approach in a prosecution for giving a minor a handgun to use in a crime of violence, §924(a)(6)(B)(ii). It would have mandated the case-specific approach in a prosecution for traveling to another State to acquire a firearm for use in a crime of violence, §924(g), but the categorical approach in a prosecution for traveling to another State to *commit* a crime of violence, §1952(a)(2). And it would have mandated the case-specific approach in a prosecution for carrying armor-piercing ammunition in connection with a crime of violence, §924(c)(5), but the categorical approach in a prosecution for carrying a firearm while "in possession of armor piercing ammunition capable of being fired in that firearm" in connection with a crime of violence, §929(a)(1).

There would be no rhyme or reason to any of this. Nor does the government offer any plausible account why Congress would have wanted courts to take such dramatically different approaches to classifying offenses as crimes of violence in these various provisions. To hold, as the government urges, that §16(b) requires the categorical approach while §924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code.

## C

Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as §16(b). It's no accident that the language of the two laws is almost exactly the same. The statutory term "crime of violence" traces its origins to the Comprehensive Crime Control Act of 1984. There, Congress enacted the definition of "crime of violence" in §16. §1001(a), 98 Stat. 2136. It also "employed the term 'crime of violence' in numerous places in the Act," *Leocal*, 543 U. S., at 6, including in §924(c). §1005(a), 98 Stat. 2138. At that time, Congress didn't provide a separate definition of "crime of violence" in §924(c) but relied on §16's general definition. The two statutes, thus, were originally designed to be read together.

Admittedly, things changed a bit over time. Eventually, Congress expanded §924(c)'s predicate offenses to include drug trafficking crimes as well as crimes of violence. §§104(a)(2)(B)–(C), 100 Stat. 457. When it did so, Congress added a subsection-specific definition of "drug trafficking crime" in §924(c)(2)—and, perhaps thinking that both terms should be defined in the same place, it also added a subsection-specific definition of "crime of violence" in §924(c)(3). §104(a)(2)(F), *id.*, at 457. But even then, Congress didn't write a new definition of that term. Instead, it copied and pasted the definition from §16 without making any material changes to the language of the residual clause. The government suggests that, in doing so, Congress "intentionally separated" and "decoupled" the two definitions. Brief for United States 34, 37. But importing the residual clause from §16 into §924(c)(3) almost word for word would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Usually when statutory language "'is obviously transplanted from . . . other legislation,'" we have reason to think "'it brings the old soil with it.'" *Sekhar* v. *United*

*States,* 570 U. S. 729, 733 (2013).

What's more, when Congress copied §16(b)'s language into §924(c) in 1986, it proceeded on the premise that the language *required* a categorical approach. By then courts had, as the government puts it, "beg[u]n to settle" on the view that §16(b) demanded a categorical analysis. Brief for United States 36–37. Of particular significance, the Second Circuit, along with a number of district courts, had relied on the categorical approach to hold that selling drugs could *never* qualify as a crime of violence because "[w]hile the traffic in drugs is often accompanied by violence," it can also be carried out through consensual sales and thus "does not *by its nature* involve substantial risk that physical violence will be used." *United States* v. *Diaz,* 778 F. 2d 86, 88 (1985). Congress moved quickly to abrogate those decisions. But, notably, it didn't do so by directing a case-specific approach or changing the language courts had read to require the categorical approach. Instead, it accepted the categorical approach as given and simply declared that certain drug trafficking crimes automatically trigger §924 penalties, regardless of the risk of violence that attends them. §§104(a)(2)(B)–(C), 100 Stat. 457.

The government's reply to this development misses the mark. The government argues that §16(b) had not acquired such a well-settled judicial construction by 1986 that the reenactment of its language in §924(c)(3)(B) should be presumed to have incorporated the same construction. We agree. See *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.,* 559 U. S. 573, 590 (2010) (interpretations of three courts of appeals "may not have 'settled' the meaning" of a statute for purposes of the reenactment canon). But Congress in 1986 did more than just reenact language that a handful of courts had interpreted to require the categorical approach. It amended §924(c) specifically to abrogate the *results* of those deci-

sions, without making any attempt to overturn the cate-
gorical *reading* on which they were based. And *that* would
have been an odd way of proceeding if Congress had
thought the categorical reading erroneous.

There's yet one further and distinct way in which
§924(c)'s history undermines the government's case-
specific reading of the residual clause. As originally en-
acted in 1968, §924(c) prohibited the use of a firearm in
connection with *any* federal felony. §102, 82 Stat. 1224.
The 1984 amendments *narrowed* §924(c) by limiting its
predicate offenses to "crimes of violence." But the case-
specific reading would go a long way toward nullifying
that limitation and restoring the statute's original
breadth. After all, how many felonies don't involve a
substantial risk of physical force when they're committed
using a firearm—let alone when the defendant brandishes
or discharges the firearm?

Recognizing this difficulty, the government assures us
that a jury wouldn't be allowed to find a felony to be a
crime of violence *solely* because the defendant used a
firearm, although it could consider the firearm as a "fac-
tor." Tr. of Oral Arg. 8. But the government identifies no
textual basis for this rule, and exactly how it would work
in practice is anyone's guess. The government says, for
example, that "selling counterfeit handbags" while carry-
ing a gun wouldn't be a crime of violence under its ap-
proach. *Id.*, at 9. But why not? Because the counterfeit-
handbag trade is so inherently peaceful that there's no
substantial risk of a violent confrontation with dissatisfied
customers, territorial competitors, or dogged police offic-
ers? And how are jurors supposed to determine that? The
defendant presumably knew the risks of his trade, and he
chose to arm himself. See *United States* v. *Simms*, 914
F. 3d 229, 247–248 (CA4 2019) (en banc) (refusing to
"condem[n] jurors to such an ill-defined inquiry"). Even
granting the government its handbag example, we suspect

its approach would result in the vast majority of federal felonies becoming potential predicates for §924(c) charges, contrary to the limitation Congress deliberately imposed when it restricted the statute's application to crimes of violence.

## D

With all this statutory evidence now arrayed against it, the government answers that it should prevail anyway because of the canon of constitutional avoidance. Maybe the case-specific approach doesn't represent the best reading of the statute—but, the government insists, it is our duty to adopt any "'fairly possible'" reading of a statute to save it from being held unconstitutional. Brief for United States 45.[6]

We doubt, however, the canon could play a proper role in this case even if the government's reading were "possible." True, when presented with two "fair alternatives," this Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly. *United States* v. *Rumely*, 345 U. S. 41, 45, 47 (1953); see, *e.g.*, *Skilling* v. *United States*, 561 U. S. 358, 405–406, and n. 40 (2010); *United States* v. *Lanier*, 520 U. S. 259, 265–267, and n. 6 (1997). But no one before us has identified a case in which this Court has invoked the canon to *expand* the reach of a criminal statute in order to save it. Yet that

---

[6] There are at least two different canons of construction that sometimes go by the name "constitutional avoidance." The one the government invokes here is perhaps better termed the presumption of constitutionality. Of long lineage, it holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, see, *e.g.*, *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830) (Story, J.), and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality, see *Rust* v. *Sullivan*, 500 U. S. 173, 190–191 (1991).

is exactly what the government seeks here. Its case-specific reading would cause §924(c)(3)(B)'s penalties to apply to conduct they have not previously been understood to reach: categorically nonviolent felonies committed in violent ways. See *Simms,* 914 F. 3d, at 256–257 (Wynn, J., concurring).[7]

Employing the avoidance canon to expand a criminal statute's scope would risk offending the very same due process and separation-of-powers principles on which the vagueness doctrine itself rests. See *supra,* at 4–5. Everyone agrees that Mr. Davis and Mr. Glover did many things that Congress had declared to be crimes; and no matter how we rule today, they will face substantial prison sentences for those offenses. But does §924(c)(3)(B) require them to suffer additional punishment, on top of everything else? Even if you think it's *possible* to read the statute to impose such additional punishment, it's *impossible* to say that Congress surely intended that result, or that the law gave Mr. Davis and Mr. Glover fair warning that §924(c)'s mandatory penalties would apply to their conduct. Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trou-

---

[7]The government claims to have found cases invoking the canon to expand a statute's reach, but none actually stands for that proposition. Each simply remarks in passing that a construction the Court arrived at for other reasons had the additional benefit of avoiding vagueness concerns; none suggests that a narrower construction was available. See *United States* v. *Grace,* 461 U. S. 171, 176 (1983) (accepting government's construction, which was "not contested by appellees"); *United States* v. *Culbert,* 435 U. S. 371, 379 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists"); *United States* v. *Shreveport Grain & Elevator Co.,* 287 U. S. 77, 82–83 (1932) (finding statute unambiguous and construing it according to "the natural import of its terms"). And the dissent, despite compiling a page-long list of constitutional avoidance cases spanning "more than 200 years," *post,* at 25–26, has been unable to find any better examples. See *post,* at 29–30 (opinion of KAVANAUGH, J.).

ble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe.

Employing the canon as the government wishes would also sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is "perhaps not much less old than" the task of statutory "construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.). And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Ibid.*; see *Lanier*, 520 U. S., at 265–266, and n. 5. Applying constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute would place these traditionally sympathetic doctrines at war with one another.[8]

## IV

What does the dissent have to say about all this? It starts by emphasizing that §924(c)(3)(B) has been used in "tens of thousands of federal prosecutions" since its enactment 33 years ago. *Post*, at 2 (opinion of KAVANAUGH, J.). And the dissent finds it "surprising" and "extraordinary" that, after all those prosecutions over all that time,

---

[8] Admittedly, abandoning the categorical approach in favor of the case-specific approach would also have the effect of excluding from the statute's coverage defendants who commit categorically *violent* felonies in *nonviolent* ways, and in that respect would be more "lenient" for some defendants. Regardless, the constitutional principles underlying the rule of lenity counsel caution before invoking constitutional avoidance to construe the statute to punish conduct that it does not unambiguously proscribe.

the statute could "suddenly" be deemed unconstitutional. *Post,* at 2–3. But the government *concedes* that §924(c)(3)(B) is unconstitutional if it means what everyone has understood it to mean in nearly all of those prosecutions over all those years. So the only way the statute can be saved is if we were "suddenly" to give it a new meaning different from the one it has borne for the last three decades. And if we could do *that,* it would indeed be "surprising" and "extraordinary."

The dissent defends giving this old law a new meaning by appealing to intuition. It suggests that a categorical reading of §924(c)(3)(B) is "unnatural" because "[i]f you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down—*what happened?*'" *Post,* at 13 (some internal quotation marks omitted). Maybe so. But the language in the statute before us isn't the language posited in the dissent's push poll. Section 924(c)(3)(B) doesn't ask about the risk that "a particular crime posed" but about the risk that an "offense . . . by its nature, involves." And a categorical reading of this categorical language seemed anything but "unnatural" to the unanimous Court in *Leocal* or the plurality in *Dimaya.*[9] Nor did the government think the categorical reading of §924(c)(3)(B) "unnatural" when it embraced that reading for decades. The dissent asks us to overlook the government's prior view, explaining that the government only defended a categorical reading of the statute "when it did not matter for constitutional vagueness purposes"—that is, before *Johnson* and *Dimaya* identified constitutional problems with the categorical approach. *Post,* at 34. But

---

[9]To be sure, the dissent suggests that *Leocal* and *Dimaya* adopted a categorical reading simply to avoid practical and constitutional problems. *Post,* at 15–16, 23, and n. 23. But, as we have seen, this too is mistaken. *Leocal* did not even mention those problems, and *Dimaya* held that the text demanded a categorical approach. See *supra,* at 9.

isn't that exactly the point? Isn't it at least a little reveal-
ing that, when the government had no motive to concoct
an alternative reading, even it thought the best reading of
§924(c)(3)(B) demanded a categorical analysis?

If this line of attack won't work, the dissent tries another
by telling us that we have "not fully account[ed] for the
long tradition of substantial-risk criminal statutes." *Post,*
at 34. The dissent proceeds to offer a lengthy bill of par-
ticulars, citing dozens of state and federal laws that do not
use the categorical approach. *Post,* at 7–10, and nn. 4–17.
But what does this prove? Most of the statutes the dissent
cites impose penalties on whoever "creates," or "engages in
conduct that creates," or acts under "circumstances that
create" a substantial risk of harm; others employ similar
language. Not a single one imposes penalties for commit-
ting certain acts during "an offense . . . that by its nature,
involves" a substantial risk, or anything similar. March-
ing through the dissent's own catalog thus only winds up
confirming that legislatures know how to write risk-based
statutes that require a case-specific analysis—and that
§924(c)(3)(B) is not a statute like that.

When the dissent finally turns to address the words
Congress actually wrote in §924(c)(3)(B), its main argu-
ment seems to be that a categorical reading violates the
canon against superfluity. On this account, reading "of-
fense" generically in connection with the residual clause
makes the residual clause "duplicate" the elements clause
and leaves it with "virtually nothing" to do. *Post,* at 20.
But that is a surprising assertion coming from the dissent,
which devotes several pages to describing the "many"
offenders who have been convicted under the residual
clause using the categorical approach but who "might not"
be prosecutable under the elements clause. *Post,* at 30–33.
It is also wrong. As this Court has long understood, the
residual clause, read categorically, "sweeps more broadly"
than the elements clause—potentially reaching offenses,

like burglary, that do not have violence as an *element* but that arguably create a substantial *risk* of violence. *Leocal*, 543 U. S., at 10. So even under the categorical reading, the residual clause is far from superfluous.

Without its misplaced reliance on the superfluity canon, there is little left of the dissent's textual analysis. The dissent asserts that the phrase "by its nature" must "focu[s] on the defendant's actual conduct"—but only because this "follows" from the dissent's earlier (and mistaken) superfluity argument. *Post*, at 21. Next, the dissent claims that "the word 'involves'" and "the phrase 'in the course of committing the offense'" both support a case-specific approach. *Post*, at 22. But these words do not favor either reading: It is just as natural to ask whether the offense of robbery *ordinarily* "involves" a substantial risk that violence will be used "in the course of committing the offense" as it is to ask whether a *particular* robbery "involved" a substantial risk that violence would be used "in the course of committing the offense." If anything, the statute's use of the present and not the past tense lends further support to the categorical reading.[10] The dissent thinks it significant, too, that the statute before us "does not use the term 'conviction,'" *post*, at 23; but that word is hardly a prerequisite for the categorical approach, as *Dimaya* makes clear. Remarkably, the dissent has noth-

---

[10] The dissent claims that *Taylor* v. *United States*, 495 U. S. 575 (1990), and *Nijhawan* v. *Holder*, 557 U. S. 29 (2009), pointed to "the *absence* of the word 'involved'" as one reason to adopt a categorical approach. *Post*, at 22. Not true. *Taylor* explained that the ACCA's elements clause requires a categorical approach in part because it refers to a crime "that 'has as an element'—not any crime that, in a particular case, involves—the use or threat of force." 495 U. S., at 600. All the work in that sentence was being done by the phrase "in a particular case," not by the word "involves." And *Nijhawan* noted that the Court had construed the ACCA's residual clause, which refers to crimes "that '*involv[e] conduct* that presents a serious potential risk of physical injury,'" to require the categorical approach. 557 U. S., at 36.

ing at all to say about §924(c)(3)'s history or its relation-
ship with other criminal statutes; it just ignores those
arguments.    And when it comes to the constitutional
avoidance canon, the dissent does not even try to explain
how using that canon to criminalize conduct that *isn't*
criminal under the fairest reading of a statute might be
reconciled with traditional principles of fair notice and
separation of powers.    Instead, the dissent seems willing
to consign "'thousands'" of defendants to prison for
"years—potentially decades," not because it is certain or
even likely that Congress ordained those penalties, but
because it is merely "possible" Congress might have done
so.    *Post,* at 30, 33–34.    In our republic, a speculative
possibility that a man's conduct violated the law should
never be enough to justify taking his liberty.

In the end, the dissent is forced to argue that holding
§924(c)(3)(B) unconstitutional would invite "bad" social
policy consequences.    *Post,* at 34.    In fact, the dissent's
legal analysis only comes sandwiched between a lengthy
paean to laws that impose severe punishments for gun
crimes and a rogue's gallery of offenses that may now be
punished somewhat less severely. See *post,* at 1–2, 30–34.
The dissent acknowledges that "the consequences cannot
change our understanding of the law." *Post,* at 34.    But
what's the point of all this talk of "bad" consequences if
not to suggest that judges should be tempted into reading
the law to satisfy their policy goals?    Even taken on their
own terms, too, the dissent's policy concerns are consider-
ably overblown.    While the dissent worries that our ruling
may elicit challenges to past §924(c) convictions, *post,* at
33, the dissent's preferred approach—saving §924(c)(3)(B)
by changing its meaning—would also call into question
countless convictions premised on the categorical reading.
And defendants whose §924(c) convictions are overturned
by virtue of today's ruling will not even necessarily receive
lighter sentences: As this Court has noted, when a defend-

ant's §924(c) conviction is invalidated, courts of appeals
"routinely" vacate the defendant's entire sentence on all
counts "so that the district court may increase the sen-
tences for any remaining counts" if such an increase is
warranted. *Dean* v. *United States*, 581 U. S. ___, ___
(2017) (slip op., at 5).

Of course, too, Congress always remains free to adopt a
case-specific approach to defining crimes of violence for
purposes of §924(c)(3)(B) going forward. As Mr. Davis and
Mr. Glover point out, one easy way of achieving that goal
would be to amend the statute so it covers any felony that,
"based on the facts underlying the offense, involved a
substantial risk" that physical force against the person or
property of another would be used in the course of commit-
ting the offense. Brief for Respondents 46 (quoting H. R.
7113, 115th Cong., 2d Sess. (2018); emphasis deleted); see
also Tr. of Oral Arg. 19 (government's counsel agreeing
that this language would offer "clearer" support for the
case-specific approach than the current version of the
statute does). The dissent's catalog of case-specific, risk-
based criminal statutes supplies plenty of other models
Congress could follow. Alternatively still, Congress might
choose to retain the categorical approach but avoid vague-
ness in other ways, such as by defining crimes of violence
to include certain enumerated offenses or offenses that
carry certain minimum penalties. All these options and
more are on the table. But these are options that belong
to Congress to consider; no matter how tempting, this
Court is not in the business of writing new statutes to
right every social wrong it may perceive.

                              *

We agree with the court of appeals' conclusion that
§924(c)(3)(B) is unconstitutionally vague. At the same
time, exactly what that holding means for Mr. Davis and
Mr. Glover remains to be determined. After the Fifth

Circuit vacated their convictions and sentences on one of the two §924(c) counts at issue, both men sought rehearing and argued that the court should have vacated their sentences on all counts.  In response, the government conceded that, if §924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not just the more limited remedy the court had granted them.  The Fifth Circuit has deferred ruling on the rehearing petitions pending our decision, so we remand the case to allow the court to address those petitions.  The judgment below is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Exhibit 2**

# United States v. Smith

United States Court of Appeals, Tenth Circuit.   Jun 30, 2014   756 F.3d 1179 (10th Cir. 2014)

No. 13–1112.

2014-06-30

UNITED STATES of America, Plaintiff–Appellee, v. Joshua Bodean SMITH, Defendant–Appellant.

O. Dean Sanderford, Assistant Federal Public Defender (Warren R. Williamson, former Interim Federal Public Defender, with him on the briefs), Denver, CO, for Defendant–Appellant. J. Bishop Grewell, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Denver, CO, for Plaintiff–Appellee.

GORSUCH

1180 *1180

O. Dean Sanderford, Assistant Federal Public Defender (Warren R. Williamson, former Interim Federal Public Defender, with him on the briefs), Denver, CO, for Defendant–Appellant. J. Bishop Grewell, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Denver, CO, for Plaintiff–Appellee.
**Before LUCERO, GORSUCH, and HOLMES, Circuit Judges.**

### GORSUCH, Circuit Judge.

Must a sentencing court studiously ignore one of the most conspicuous facts about a defendant when deciding how long he should spend in prison? After a court sentences a man to many decades in prison for using a gun during a crime of violence, must the court pretend the gun sentence doesn't exist when weighing an appropriate prison term for the underlying crime of violence?

That's the blinkered view the government persuaded the district court to adopt in this case. No one doubts that Joshua Smith deserves a long prison sentence. He robbed two stores and

1181 shot the managers in both. For his conduct he stands *1181 convicted of two counts of robbery (18 U.S.C. § 1951) and two counts of using a gun "during and in relation to" those "crime[s] of violence" (18 U.S.C. § 924(c)). At sentencing, the district court began by recognizing that § 924(c) mandated a 35–year prison term for Mr. Smith's gun use during the robberies. Turning then to the task of fixing a sentence for the robberies themselves, the court acknowledged any robbery sentence had to run consecutively to, not concurrently with, the mandatory gun sentence. Still, the question remained how long Mr. Smith's robbery sentence shoul[d] ▣ Download   ⚑ Check if overturned   2045—when Mr. Smith will be 55 years old and otherwise eligible for release—might be necessary and just.

case the district court decided there was one set of facts it had to disregard—Mr. Smith's § 924(c) gun convictions and the lengthy sentence it just issued for them.

When it comes to those facts alone the government argued and the district court held a sentencing judge must remain willfully blind. According to the government, a sentencing judge is powerless to reduce by a year, a month, or a day the prison time it issues for an underlying crime of violence in light of a simultaneously issued § 924(c) gun sentence. A judge can't so much as consider the fact a § 924(c) conviction and sentence exist. Even if the § 924(c) conviction and sentence guarantee the defendant a prison term of many decades. Even if the § 924(c) prison term is certain to outlast the defendant's life and the lives of every person now walking the planet—itself no fanciful possibility. *See, e.g., Deal v. United States,* 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); *United States v. Angelos,* 345 F.Supp.2d 1227, 1260–61 (D.Utah 2004), *aff'd,* 433 F.3d 738 (10th Cir.2006). On the government's view, a district court must always and categorically disregard the sentence it has just pronounced for a § 924(c) gun conviction when turning to consider an appropriate sentence for the underlying and intimately related crime of violence. Such a rule may not test the limits of the human capacity for self-deception. But if allowed to stand it would transform the act of sentencing in these cases from a searching and fact-sensitive inquiry aimed at finding a fitting punishment into an enterprise built on a fiction, even a suspension of disbelief.

We are convinced the law doesn't require so much from sentencing courts. Neither should the perfidiousness of a defendant's conduct be allowed to obscure (or perhaps warp) the law's teachings on this score. Viewed with a cold eye, the relevant statutes permit a sentencing court to consider a defendant's § 924(c) conviction and sentence just as they permit a sentencing court to consider most any other salient fact about a defendant. To say this much isn't to suggest a sentencing court *must* reduce a defendant's related crime of violence sentence in light of his mandatory gun enhancement sentence under § 924(c). Only that the court is not *required* to feign the sort of ignorance the government demands.

\*

We begin with 18 U.S.C. § 3661. "No limitation," says the statute, may be placed on a court's power to consider information about a defendant's "background, character, and conduct" when seeking to fashion an appropriate sentence. *Id.* As the Supreme Court has explained, this provision ensures sentencing judges access to "the widest possible breadth of information about a defendant" so that the punishments they issue "suit not merely the 1182 offense but the individual." \*1182 *Pepper v. United States,* —— U.S. ——, 131 S.Ct. 1229, 1240, 179 L.Ed.2d 196 (2011) (quoting *Wasman v. United States,* 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984)); *see also Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) ("[T]he punishment should fit the offender and not merely the crime."). In this way, the statute preserves a long tradition, one extending back "before ... the American colonies became a nation," a tradition of affording judges "discretion in the sources and types of evidence" they may consult at sentencing, subject of course and always to the Constitution's constraints. *Pepper,* 131 S.Ct. at 1240 (quoting *Williams,* 337 U.S. at 246, 69 S.Ct. 1079).

The government's theory in this appeal sits uncomfortably with § 366 1, the Supreme Court's interpretation o[...] er than ensure a sentence predicated on [...] s us to bar

Download    Check if overturned

information available to sentencing courts risks "directly contraven[ing] Congress'[s] expressed intent in § 3661." *Pepper*, 131 S.Ct. at 1242. Despite the Court's declaration that § 3661's "broad language" does not provide "any basis for the courts to invent a blanket prohibition against considering certain types of evidence at sentencing." *United States v. Watts*, 519 U.S. 148, 152, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam). And despite the fact the Court has rejected proposal after proposal seeking to impose non-constitutional limits on the information a court may consider at sentencing. *See, e.g., Williams v. Oklahoma*, 358 U.S. 576, 584–86, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959) (rejecting categorical bar against considering conduct related to one count of conviction when sentencing for an independent count of conviction); *Nichols v. United States*, 511 U.S. 738, 746–49, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (defendant's prior convictions); *Witte v. United States*, 515 U.S. 389, 397–401, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (conduct for which the defendant may later be prosecuted and convicted); *Pepper*, 131 S.Ct. at 1241–43 (post-conviction rehabilitation efforts).

The government's theory in this appeal sits uneasily, too, with the even more specific guidance the Supreme Court has provided about § 3661's application in the § 924(c) context. In *United States v. Watts*, the Court read § 3661 to permit a sentencing court to find by a preponderance of the evidence that the defendant engaged in the conduct alleged in a § 924(c) charge—even though he was *acquitted* on that charge—and then use that finding to enhance his sentence for the underlying crime of violence. 519 U.S. at 156–57, 117 S.Ct. 633. And given that, one might well ask this: How can it be that § 3661 authorizes a sentencing court to consider facts related to a defendant's § 924(c)*acquittal* when fashioning a sentence for the underlying crime of violence but not facts related to his § 924(c)*conviction and sentence?*

If anything, the case for applying § 3661 would seem a good deal more compelling here than there. After all, even if § 3661 allows the practice in *Watts* one could debate whether the Constitution prohibits it, forbidding courts (at least usually) from imposing greater punishments that depend on facts neither admitted by the defendant nor found by a jury. *See Alleyne v. United States*, —— U.S. ——, 133 S.Ct. 2151, 2160–63, 186 L.Ed.2d 314 (2013); *Rita v. United States*, 551 U.S. 338, 373, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (Scalia, J., concurring in part and concurring in the judgment). Meanwhile, no one has identified

1183 *1183 any constitutional imperative that might prevent sentencing courts from applying § 3661 to reduce crime of violence sentences in light of simultaneously issued § 924(c) sentences. For that matter, in its briefs to this court the government doesn't even mention § 3661 or any of the Supreme Court's guidance about its scope or the tradition it codifies.

\*

Still, that's just the beginning of the government's troubles. While § 3661 explains what a district court *may* consider at sentencing, 18 U.S.C. § 3553(a) describes what a district court *must* consider when sentencing for crimes that lack a mandatory sentence prescribed by statute—crimes like Mr. Smith's underlying § 1951 robbery convictions. In what's often called its parsimony principle, § 3553(a) directs courts to "impose a sentence sufficient, but not greater than necessary, to comply" with several (admittedly incommensurate) policy goals. Goals including a just punishment, adequate deterrence, and protection of the public. And here again it is difficult to reconcile the government's insistence that district courts must categorically igno   📷 Download      🏳 Check if overturned   tatute's demands.

find that the length of the public's guaranteed protection from a defendant thanks to a mandatory § 924(c) sentence informs its analysis of the public's unmet need for further protection when it comes to sentencing the defendant for his related crime of violence. After all, the marginal benefit for public protection may appear quite different when a defendant is 23 years of age—as Mr. Smith is now—and only recently removed from criminal conduct compared to when he is 55 years old and 35 years removed from his last criminal act—as Mr. Smith will be, approximately, when his mandatory § 924(c) sentences end. *Cf.* Miles D. Harer, Fed. Bureau of Prisons, *Recidivism Among Federal Prisoners Released in 1987,* at 3, 12 (1994) (reporting recidivism rates "inversely related to age at release").

In fact, sentencing courts routinely consider facts just like these. They routinely consider the impact of a sentence already issued for one count of conviction when trying to determine the appropriate punishment under § 3553(a) for a related count of conviction.[1] Neither does the government dispute the propriety of the practice. To the contrary, the government expressly concedes that district courts normally may find "other sentences" issued for related counts of conviction relevant *1184 when applying " § 3553(a)'s broad categories of consideration" to ascertain an appropriate punishment for a remaining count of conviction. Gov't Br. 29.

> [1] *See, e.g., Pepper,* 131 S.Ct. at 1251; *Greenlaw v. United States,* 554 U.S. 237, 253–54, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008); *United States v. Vidal–Reyes,* 562 F.3d 43, 49 n. 4 (1st Cir.2009); *United States v. Bay,* 820 F.2d 1511, 1514 (9th Cir.1987) (a sentencing court is not required to "evaluate the gravity of each separate crime upon which a conviction was obtained, and then select a punishment that would be appropriate for each if considered independently of any other crimes."); *cf. United States v. Yeje–Cabrera,* 430 F.3d 1, 15 (1st Cir.2005) (forfeiture order part of sentencing package); *United States v. Teel,* 691 F.3d 578, 585–86 (5th Cir.2012) (bribery and fraud prison terms); *United States v. Flaschberger,* 408 F.3d 941, 943–44 (7th Cir.2005) (restitution order); *United States v. Noble,* 299 F.3d 907, 910 (7th Cir.2002) (cocaine possession and conspiracy prison terms); *United States v. Horob,* 735 F.3d 866, 871 (9th Cir.2013) (identity theft mandatory minimum prison term); *United States v. Jefferson,* 308 Fed.Appx. 2, 4 (7th Cir.2009); *United States v. Hamilton,* 323 Fed.Appx. 27, 31 (2d Cir.2009). *See generally* 12A Beth Bates Holliday, *Cyclopedia of Federal Procedure* § 52:10 (3d ed.2014).

\*

So where does that leave us? Under a longstanding American tradition embodied in § 3661 and § 3553(a), federal courts seeking a just sentence may look to the whole of the defendant's person, character, and crimes. As part of this tradition, sentencing courts may examine and consider the impact of contemporaneously issued sentences.

The government replies that two subsections lurking within § 924(c) itself undo this tradition when it comes to gun charges. But while more specific statutory terms surely can trump more general statutory guidance, neither will we lightly assume Congress intended radical change to historical sentencing practices. After all, "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 468, 121 📄 Download     🚩 Check if overturned *'son v. PPG Indus., Inc.,* 446 U.S. 578, 602, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (Rehnquist, J., dissenting)

may take into consideration the fact that a watchdog did not bark in the night."). A peek inside the two subsections the government asks us to inspect, moreover, reveals none of the radical change the government promises, only empty mouseholes.

The first subsection the government points to, 18 U.S.C. § 924(c)(1)(D)(ii), states that mandatory minimum gun sentences may not run concurrently with "any other term of imprisonment imposed on the" defendant, including any prison term imposed for the defendant's underlying crime of violence. Plainly, this language ensures that convictions on gun charges and crimes of violence run consecutively even if the district court might find justice better served by concurrent sentences. In this way, the statute clearly does alter the normal operation of § 3553's parsimony principle: consecutive sentences must be issued even if the district court thinks concurrent sentences sufficient to meet § 3553(a)'s policy objectives.

But more than this § 924(c)(1)(D)(ii) does not purport to do. It does not say that in calculating the length of a (consecutive) crime of violence sentence a district court must ignore the length of the mandatory minimum gun sentence. It does not limit the factors the court may and must consider when setting a sentence for the crime of violence. It does not increase the penalties for the underlying crime of violence. In fact, it does not say *anything* about how the underlying crime of violence must be punished, about what the "other term of imprisonment" must be. The statute leaves that task to the usual sources of sentencing law outside § 924(c), including § 3661 and § 3553. Section 924(c)(1)(D)(ii) says simply that § 924(c)'s mandatory minimums must run consecutively to "any other term of imprisonment." And that means *any* other term of imprisonment.

Our thoughtful colleague in dissent disputes none of this. Instead, he joins the government in relying on a second subsection, 18 U.S.C. § 924(c)(1)(A). Our colleague insists *this* provision "unambiguous[ly]" and "plain[ly]" withdraws the district court's normal sentencing powers. Dissent at 1194–95. But, respectfully, we don't see how this subsection 1185 is any more *1185 telling than the last. This subsection says simply that "in addition to the punishment provided for" the defendant's underlying offense (in Mr. Smith's case, robbery), a defendant must be sentenced to "a term of imprisonment of not less than" a certain specified number of years for his gun offense.

By its plain terms, this language ensures that a § 924(c) gun sentence is indeed a mandatory minimum sentence. This language explains that the defendant's prescribed sentence for his gun use must be at least a certain number of years ("not less than ...") and must be joined with or added to (come "in addition to") the sentence provided for his underlying offense. In this way, the statute clarifies, too, that where courts once often thought a robbery or drug transaction involving a gun constituted a single punishable offense, now two separate statutory offenses exist to be punished. And the subsection guarantees that—whatever the defendant's sentence for his underlying offense—he will *at least* and *always* serve a certain number of years for his gun crime.

But while doing all this, the subsection says *nothing* about the quantum of punishment a defendant should receive for his underlying offense. Instead, the provision speaks of its mandatory minimum gun sentences as coming "in addition to the punishment *provided* " for the underlying offense. So it is the statute here (again) takes it as given that the proper scope of punishment for a de[fen]         ne other lawful source. And, of course, ... .. ... ....u ....., ...v .v..v.., .... 1951), combined

📄 Download    🚩 Check if overturned

Put differently, § 924(c)(1)(A) serves to ensure sentences for gun use are indeed mandatory and minimum ones. It requires specific prison terms for using or carrying a firearm and requires those terms to be served "in addition to"—joined with, added to— *whatever* punishment is " *provided* " by other laws for a defendant's underlying offense. As significant as all this may be, it does not go so far as to "provide" the sentence or sentencing procedure for a defendant's underlying offense. Nothing in the subsection purports to displace traditional sentencing laws and practices with respect to *that* conviction. There are no elephants hiding here.

\*

That the government wishes us to impress on § 924(c) a good deal more than that its text will sustain finds further confirmation from a statutory cousin. In the identity theft context Congress has altered traditional sentencing practices in the very way the government now wishes us to alter them in the gun use context. Congress has acted in the identity theft context plainly and unmistakably. All this strongly suggests that the first branch knows exactly how to alter traditional sentencing practices when it wishes, that when it does so it does so in ways and places clear enough for all to see—and that it has done nothing of the kind in § 924(c).

Just as § 924(c) makes it a crime to use firearms "during and in relation to" crimes of violence, 18 U.S.C. § 1028A criminalizes identity theft "during and in relation to" certain enumerated felonies. Like § 924(c)(1)(A), § 1028A(a) specifies that the penalties for the crime it creates come "in addition to the punishment provided for" the underlying offense. And like subsection (c)(1)(D)(ii) of § 924, subsection (b)(2) of § 1028A provides that 1186 certain mandatory minimum prison terms for identity theft must run consecutively to *1186 any other term of imprisonment for the underlying felony conviction. Many courts have recognized the generally parallel construction of these statutes. *See, e.g., Vidal–Reyes,* 562 F.3d at 51–52; *United States v. Magassouba,* 619 F.3d 202, 206 (2d Cir.2010); *United States v. Jenkins–Watts,* 574 F.3d 950, 970 (8th Cir.2009). *See generally* Molly Booth, Comment, *Sentencing Discretion at Gunpoint: How To Think About Convictions Underlying § 924(c) Mandatory Minimums,* 77 U. Chi. L.Rev. 1739, 1746–48 (2010).

But after subsection (b)(2), § 1028A veers off in a different direction, adding something new and telling in subsection (b)(3). There the statute provides that

in determining any term of imprisonment to be imposed for the felony during which the [identity theft occurred], a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section[.]

By its plain terms, this language prohibits a district court from considering any sentence imposed under § 1028A when sentencing the defendant for his underlying felony.

Here, then, is *exactly* the language the government wants to read into § 924(c). It is clear and unqualified. Proof that Congress knows exactly how to strip district courts of their traditional sentencing discretion when it wishes to do so. Further proof too that § 924(c) lacks any such command. After all, it is axiomatic that such notable linguistic differences in two otherwise similar s              nces in meaning. *See, e.g., United States*              70 L.Ed.2d 640


two statutes may be similar in language and objective, we must not fail to give effect to the differences between them."). And here the difference in language is unmistakable. So much so that if we adopted the government's reading of § 924(c) as imposing a categorical bar on considering mandatory gun prison terms when sentencing for underlying crimes, we'd surely have to read the virtually identical language of § 1028A in parallel fashion—and in this way render subsection (b)(3) superfluous, itself always a disfavored result in the business of statutory interpretation. *See, e.g., TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).[2]

> [2] Underscoring the point is how courts have interpreted § 1028A(b)(3). At least two circuits have held that subsection (b)(3)'s language does *only* what it says—preventing a sentencing court from taking account of § 1028A's mandatory minimums when considering a sentence for predicate offenses, but permitting sentencing courts to consider § 1028A mandatory minimums when sentencing for *other* convictions that don't qualify as predicate offenses. *Vidal–Reyes,* 562 F.3d at 56; *United States v. Wahid,* 614 F.3d 1009, 1013–14 (9th Cir.2010). In reaching this conclusion, these courts have expressly rejected the government's argument, which it ventures again here, that the statute's "consecutive sentence requirement" effectively forbids sentencing judges from considering the length of the mandatory minimum when determining the term of imprisonment for all accompanying counts of conviction. *See Vidal–Reyes,* 562 F.3d at 52–53.

Neither does the government's response help its cause. The government doesn't dispute that § 1028A parallels § 924(c) in many ways. It doesn't dispute that the differences between these two similar statutes suggest differences in meaning. It doesn't dispute that its reading of § 924(c) would, by parallel application in § 1028A, render § 1028A(b)(3) superfluous. 1187Instead*1187 the government observes that § 1028A was passed in 2004, many years after § 924(c), and from this the government surmises that § 1028A(b)(3) was "likely drafted in response to earlier attempts by defendants in the § 924(c) context to do what [Mr.] Smith is doing here." Gov't Br. 29. But the government's musings here are no more than that: the government nowhere seeks to document its guesswork about Congress's imagined collective purpose. And even if the government could document its guesswork, it would hardly help its cause. Even supposing Congress intended § 1028A(b)(3) to say what it believed § 924(c) meant to say all along, that would serve only to prove that Congress itself realizes § 924(c)'s words do not prevent sentencing judges from considering mandatory minimum sentences. It would highlight, too, the fact that Congress has been on notice of this issue for many years and declined to modify § 924(c) even as it has chosen to adopt § 1028A(b)(3) and amend § 924(c) in various other ways. *See* Act of Oct. 6, 2006, Pub.L. No. 109–304, § 17(d)(3), 120 Stat. 1485, 1707 (2006); Act of Oct. 26, 2005, Pub.L. No. 109–92, § 6(b), 119 Stat.2095, 2102 (2005); *cf. Ressam,* 553 U.S. at 277, 128 S.Ct. 1858 ("While it is possible that this omission was inadvertent, that possibility seems remote given the stark difference that was thereby introduced into the otherwise similar texts...."). In any event, we are of course bound by the language Congress actually employed in § 924(c)— not by the (conjectured) aims of a subsequent Congress drafting a different statute decades later. *See Bruesewitz v. Wyeth LLC,* —— U.S. ——, 131 S.Ct. 1068, 1081–82, 179 L.Ed.2d 1 (2011); *United States v. United Mine Workers of Am.,* 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

Recognizing the weak— of th— —th— — —di— —ti— 'league offers another of his own dev 📄 Download   🏴 Check if overturned ) to § 1028A merely to underscore the point it already made in subsection (b)(2). Sometimes, our colleague


democratic authority requires unelected federal judges to exercise great caution before declaring the words enacted by the people's representatives to be superfluous. As the Supreme Court has (repeatedly) instructed, "[i]t is our duty to give effect, if possible, to every clause and word of a statute" and we should be "reluctant to treat statutory terms as surplusage in any setting." *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks and brackets omitted). In fact, the Court has called this a "cardinal principle" of statutory construction. *Id.* Our reading of § 1028A abides these directions and affords meaning to all of Congress's words while our respected colleagues' reading does not, effectively leaving an entire statutory subsection with nothing to do.[3]

> [3]  Neither, for that matter, does the legislative history our colleague points to license reading plain statutory terms out of the law. It merely offers an overview of § 1028A's provisions and remarks unremarkably that they are meant "to ensure the intent of [the] legislation is carried out." H.R.Rep. No. 108–528, at 10 (2004), *reprinted in* 2004 U.S.C.C.A.N. 779, 785–86.

\*

So far we've consulted the traditional statutory sentencing structure in § 3661 and § 3553(a), the specific language of § 924(c) itself, and a close legislative cousin in § 1028A. All point against the government. But what if we broaden our view still further and ask 1188 about those who ventured down this road before us? Have \*1188 they found the enormous change to traditional sentencing principles hidden in § 924(c) that we cannot find? The answer does little to help the government's cause.

Take the sentencing commission. It isn't necessary for us to decide what deference (if any) this court owes the commission's interpretations of sentencing statutes. For our present purposes it is surely notable, however, that those appointed by Congress to advise the federal courts on their sentencing responsibilities don't seem to read § 924(c) as the government proposes. The advisory sentencing guidelines expressly state that a § 924(c) sentence *should* influence (and serve to reduce) a sentencing court's calculation of the guidelines range for the underlying offense in at least one way. When a § 924(c) sentence exists, § 2K2.4 advises district courts not to apply certain otherwise available enhancements for the defendant's underlying criminal conduct. Applying weapon enhancements while also sentencing under § 924(c) would amount to "duplicative punishment" in the commission's view by counting the defendant's weapon use twice. *See U.S. Sentencing Guidelines Manual* app. C, amend. 599; *id.* § 2K2.4 cmt. n.4. If, as the government supposes in this appeal, the statute's text barred district courts from considering § 924(c) punishments when issuing sentences for underlying offenses, the guidelines' concern about double-counting would violate this textual command. After all, the government tells us a district court may *never* consider a § 924(c) sentence when fashioning a sentence for the underlying crime— precisely what the Sentencing Commission in § 2K2.4 says a district court *ought* to do.[4]

> [4]  The dissent suggests the government's reading of § 924(c) might be reconciled with § 2K2.4 if the guideline is interpreted to permit considering the § 924(c)*conviction* alone, apart from the accompanying *sentence. See* Dissent at 1196. But of course § 2K2.4 fears duplicative *punishment* and does so only because the § 924(c) conviction comes with a prison *sentence* attached.


disregard § 924(c) mandatory minimums when fixing related prison sentences. In fact, § 5G1.2(a) does no such thing. That provision merely advises that mandatory minimum sentences like those found in § 924(c) should "be determined by that statute and imposed independently" of other sentences. So a § 924(c) gun sentence should be determined by the minimums prescribed in that statute rather than using a § 3553(a) analysis (no surprise there) and should run consecutively to any other sentence imposed for the underlying crime (no surprise there either). Absent in § 5G1.2(a) is any suggestion that the sentence *for the underlying crime* must be calculated without reference to the existence of the § 924(c) sentence. *See United States v. Rodriguez,* 112 F.3d 26, 30 (1st Cir.1997); *Vidal–Reyes,* 562 F.3d at 55. Indeed, the applicable note confirms that § 5G1.2(a) only requires that § 924(c)'s mandatory minimum "be imposed to run consecutively to any other term of imprisonment." *U.S. Sentencing Guidelines Manual* § 5G1.2 cmt. n.2. Here again there is no effort to control or dictate what that "any other term of imprisonment" should be.

Next consider the case law. The government argues before this court that § 924(c)(1)(A) and (c)(1)(D)(ii) radically limit district courts' traditional discretion to fashion punishments for underlying offenses that are both condign and fully considered. Yet for years the government has suggested just the opposite—contending in case after case that district courts *may and should* consider § 924(c) sentences when sentencing for related crimes. And court after court has agreed.

Many cases arise this way. In light of § 924(c)'s mandatory minimum for a gun charge, the district judge decides that a relatively modest sentence for the underlying crime of violence (or drug offense) would serve § 3553(a)'s parsimony principle. Then the court of appeals 1189 overturns *1189 the § 924(c) conviction and, despite the defendant's protests, permits the district court to revisit and adjust upward its sentence for the underlying crime. At no point in this process does the government say what it says here—that it would be entirely wrong for a district court to assess the impact of the § 924(c) sentence when sentencing for the underlying offense under § 3553(a). Instead, the government says *of course* the district court properly considered the § 924(c) sentence in its original § 3553(a) sentencing analysis for the underlying crime. And the government says *of course* the district court on remand should now account for the fact that the § 924(c) sentence is gone. The government says all this even when the district court in the initial sentencing proceeding offered no hint that the defendant's mandatory § 924(c) sentence influenced its sentence for the underlying crime.

Typically, the government's argument goes like this: "[T]he fact that the District Court imposed separate sentences on [the defendant] for each count of conviction did not diminish their legal relatedness...." [5] And typically the courts of appeals respond with a remand for resentencing like this: "Clearly, the § 924(c) offense and the underlying offense are interdependent and result in an aggregate sentence, not sentences which may be treated discretely." [6]

---

[5] Brief for the United States of America at 18, *Rodriguez v. United States,* 116 F.3d 1002 (2d Cir.1997) (No. 96–2763), 1996 WL 33667818; *see also* Final Brief and Addendum for Appellee at 18, *United States v. Townsend,* 178 F.3d 558 (D.C.Cir.1999) (No. 98–3041), 1998 WL 35240367 ("[T]he inter-dependency between § 924(c) and [the guidelines calculation for the underlying drug offense] results in an aggregate sentence for drug convictions and simultaneous § 924(c) convictions, not separate and distinct sentences for each violation."); Brief of Plaintiff-Appellee United States of America at 12, *United States v. Watkins,* 147 F.3d




6   *United States v. Mendoza,* 118 F.3d 707, 710 (10th Cir.1997); *see also United States v.*
*Townsend,* 178 F.3d 558, 568 (D.C.Cir.1999) ( "[A] mandatory [§ 924(c) ] sentence may
influence the sentence imposed on other counts."); *United States v. Rodriguez,* 112 F.3d 26 (1st
Cir.1997); *United States v. Mata,* 133 F.3d 200 (2d Cir.1998); *United States v. Davis,* 112 F.3d
118 (3d Cir.1997); *United States v. Smith,* 115 F.3d 241 (4th Cir.1997); *United States v.*
*Rodriguez,* 114 F.3d 46 (5th Cir.1997); *Pasquarille v. United States,* 130 F.3d 1220 (6th
Cir.1997); *United States v. Smith,* 103 F.3d 531 (7th Cir.1996); *Gardiner v. United States,* 114
F.3d 734 (8th Cir.1997); *United States v. McClain,* 133 F.3d 1191 (9th Cir.1998); *United States*
*v. Easterling,* 157 F.3d 1220 (10th Cir.1998); *United States v. Watkins,* 147 F.3d 1294 (11th
Cir.1998).

That in all these cases stretching back nearly twenty years no one has found anything
cowled within § 924(c) to prohibit district courts from accounting for a § 924(c) sentence
when fixing the length of a related sentence—that the government itself has previously
argued that the relevant statutes *allow* district courts just this discretion—surely counts as
further evidence that the government's current interpretation of § 924(c) is, well, rather
1190 remarkable.[7] *1190

7   The dissent suggests that the weapon enhancement provision in § 2K2.4 "explains" why
district courts may reconsider underlying offense sentences upon a defendant's successful
challenge to a § 924(c) conviction. As the dissent notes, once the § 924(c) conviction
evaporates applying a weapon enhancement for the underlying offense no longer threatens to
count the same conduct twice. *See* Dissent at 1196 n. 1. But none of this helps the dissent's
cause. Even if true, it still implies that a § 924(c) punishment *may* be considered at sentencing
for an underlying offense. Besides, in truth, these cases generally don't restrict the sentencing
judge's discretion at resentencing solely to applying the weapon enhancement. *See, e.g.,*
*Townsend,* 178 F.3d at 568 (collecting cases).

Of course and as our dissenting colleague rightly notes, a handful of recent cases from
outside the resentencing context do adopt the government's (current) view that § 924(c)
mandatory minimums may never influence the sentence for an underlying crime. *See*
Dissent at 1195.[8] Yet many others expressly reject just this line.[9] Neither do we find the
dissent's handful of cases persuasive on their own terms. They are often terse to the point of
being summary (one contains two paragraphs of reasoning, another four). None pauses to
consider the import of § 3661. None addresses § 924(c)'s demand only that its sentences run
consecutively to *any* other sentences, in addition to *whatever* punishment is "provided for"
underlying offenses, without purporting to provide that punishment itself or affect its
length. All overlook § 1028A, failing to consider the fact their interpretations of § 924(c)
effectively render § 1028A(b)(3) superfluous. None repudiates (or even mentions) the many
cases—including cases from these very same courts—treating § 924(c) and underlying
sentences as properly interrelated when the government seeks resentencing after the
defendant's § 924(c) conviction is vacated. One case even seems to treat the sentencing
guidelines as binding rather than advisory.

8   *See, e.g., United S̲ .  .  .  .  .  .  .  .  .  .  .  .   ̲tates v. Chavez,*
549 F.3d 119, 133-   📄 Download    🏳 Check if overturned    34–85 (6th
Cir.2007); *United States v. Hatcher,* 501 F.3d 931, 933 (8th Cir.2007); *United States v. Powell,*

[9] *See, e.g., United States v. Webster,* 54 F.3d 1, 4 (1st Cir.1995) ("[I]n departing from a guideline sentence the district court is free to exercise its own judgment as to the pertinence, if any, of a related mandatory consecutive sentence [under § 924(c) ]."); *Franklin,* 499 F.3d at 587–89 (Moore, J., concurring in the judgment); *United States v. Ezell,* 417 F.Supp.2d 667, 678 (E.D.Pa.2006), *aff'd on other grounds,* 265 Fed.Appx. 70 (3d Cir.2008); *Angelos,* 345 F.Supp.2d at 1260; *United States v. Ciszkowski,* 430 F.Supp.2d 1283, 1288 (M.D.Fla.2006), *aff'd on other grounds,* 492 F.3d 1264, 1271 (11th Cir.2007); *United States v. Roberson,* 573 F.Supp.2d 1040, 1050–51 (N.D.Ill.2008); *United States v. Barton,* 442 F.Supp.2d 301, 303–04 (W.D.Va.2006); *United States v. Bailey,* No. CR 12–4083–MWB–2, 2013 WL 4735697 (N.D.Iowa Sept. 3, 2013).

Neither can anyone be expected to remain insensible to the anomaly the government's notably inconsistent advocacy on this issue would seem to invite. On the one hand, the government seems to think that when a sentencing judge shows any sign of accounting for § 924(c) by reducing prison time for an underlying offense, it can object and require the latter sentence to be independently calculated (and in all likelihood longer). On the other, the government presumably wishes to preserve the option to insist on the recalculation (and in all likelihood the lengthening) of underlying offense sentences should any § 924(c) convictions be overturned, because whether or not the sentencing court showed any sign of doing so it did consider the § 924(c) sentence in its § 3553(a) analysis for the underlying crime. But it seems to us that district courts either may lawfully consider § 924(c) when sentencing for underlying offenses under § 3553(a) or they may not. Surely (hopefully) the government does not mean to suggest a district court may consider a § 924(c) sentence only when that helps it win longer prison terms.

\*

With so much against it in the text and structure of the relevant statutes, with so little
**1191** support from administrative or case law authorities, the government is left with \*1191 a vague purposive argument. Because Congress meant to be "severe" in punishing § 924(c) for gun convictions with long mandatory minimum sentences, we should *also* ensure "severity" by precluding district courts from taking § 924(c) sentences into account even when they are engaged in sentencing for separate convictions under § 3661 and § 3553(a). *Cf.* Dissent at 1194–95. If there's any doubt about how best to interpret § 924(c), we should opt for the more severe option to effect (presumed) congressional intent: a sort of rule-of-severity interpretive canon, if you will.

This suggestion commits the logical mistake of overgeneralization. Because the statute may command severity in one way (lengthy mandatory minimums for gun convictions) the government surmises we should be severe in another way too (upending normal sentencing procedure for related crimes). But that much doesn't follow. Rather than attempt to divine some abstract purposes the government surmises Congress sought to achieve and then force all the statute's provisions into their service, courts owe respect first and foremost to "the means [Congress] has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomm'ns Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 ⌷ single purpose unrelentingly. In the re [⊞ Download] [⚑ Check if overturned] and seek to balance disparate interests. And it's hardly strange to think that Congress might have wished to

*Governors v. Dimension Fin. Corp.,* 474 U.S. 361, 374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself ... prevents the effectuation of congressional intent."); *Genova v. Banner Health,* 734 F.3d 1095, 1099 (10th Cir.2013) ("[O]ne can go badly awry assuming ... that *whatever* might seem to further a statute's primary objective must be the law." (citation and quotation marks omitted)).

Besides, even if the government's arguments about the import of § 924(c)(1)(A) and (c)(1)(D)(ii) might be thought by others to contain some ambiguous force we have failed to appreciate fully, we don't default to a presumption of severity but to the rule of lenity. The rule of lenity dictates that any doubts at the end of a thorough statutory investigation must be resolved for the defendant, any tie must go to the citizen, not the state. In our legal order it is not the job of independent courts to bend ambiguous statutory subsections in procrustean ways to fit the prosecutor's bill. *See, e.g., Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980); *United States v. R.L.C.,* 503 U.S. 291, 305–06, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992); *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–22, 73 S.Ct. 227, 97 L.Ed. 260 (1952).

The government's contrary argument brings to mind *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). There the trouble began when Congress set minimum and maximum sentences for cocaine offenses at a 100:1 powder-to-crack ratio. From this fact, the government inferred that courts sentencing *between* the minimum and maximum had to use the same 100:1 ratio. Though nothing in the statutory text compelled such a result, the government argued that anything less would've offended Congress's overarching (if unexpressed) purpose. The Supreme Court rejected that view emphatically 1192because it "lack[ed] grounding" in the statutory text. *1192 552 U.S. at 102, 128 S.Ct. 558. The statute in that case set sentencing floors and ceilings using a 100:1 ratio but said "nothing about the appropriate sentences within these brackets" and left those matters to the normal operation of § 3661 and § 3553(a). *Id.* at 102–03, 128 S.Ct. 558. Exactly the same holds true here. The statute in our case sets sentencing floors for gun crimes under § 924(c). We respect and enforce that direction. But nothing in § 924(c) speaks to the length of sentence a district court must issue for an underlying crime or the factors it may or must consider. The sort of restrictions the government seeks simply lack grounding in statutory text. [10]

[10] It may pose a nice question, too, just how far Congress may go, consistent with the Constitution's guarantees, in forcing a sentencing judge to disregard undisputed facts about a defendant. *See Pepper,* 131 S.Ct. at 1240 (noting that "both before and since the American colonies became a nation," courts have had "wide discretion in the sources and types" of information used to assist at sentencing). But, happily, it is a question we need not answer in this case because, as we've seen, nothing in the text of § 924(c) compels such a result.

\*

Having said so much to this point we should take care to emphasize what we have not said. If sentencing judges may take § 924(c) sentences into account when sentencing for underlying offenses, the dissent seems to worry as a pragmatic matter that nothing will prevent them from issu̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ because they think the mandatory § 924(c̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ ̲ nothing we've said

📄 Download    🚩 Check if overturned

has prescribed. In this appeal, we recognize instead and only that the length of a § 924(c) sentence can at least sometimes bear legitimate relevance to the sentencing considerations (like the time needed to ensure the protection of the public) that Congress has statutorily directed courts to consider when sentencing for the underlying crime.

Even here our point is exceedingly narrow. We don't mean to suggest that a district court *must* reduce a defendant's crime of violence sentence in light of a related § 924(c) sentence. We don't even mean to suggest a sentencing judge *should* determine what bottom-line aggregate sentence best serves her understanding of a just punishment for all of the defendant's crimes and then adjust the individual sentences to achieve that result. Instead, we acknowledge simply that a district court *may* at least sometimes find the length of a § 924(c) sentence relevant to the sentencing factors Congress has expressly directed it to consider when sentencing for an underlying crime. The government admits that a district court generally may find "other sentences" it has issued for related counts of conviction relevant when applying " § 3553(a)'s broad categories of consideration" to ascertain an appropriate punishment for a remaining count of conviction. Gov't Br. 29. Today we hold only that nothing in § 924(c) upends this traditional principle.

To be sure, allowing district courts to consider a § 924(c) conviction and sentence for *proper* purposes cannot guarantee that none will ever consider a § 924(c) conviction and sentence for *improper* purposes. But that sort of problem is always present at sentencing— it's always possible courts might reduce or increase a sentence for reasons not authorized by law. And the solution for that problem is already in hand: we engage in appellate review of 1193 sentences to guard *1193 against such abuses of discretion. *See* 18 U.S.C. § 3742. Courts of appeals are fully empowered to intervene when a district court bases a sentence solely on hostility to Congress's laws (including § 924(c)) rather than a good-faith application of Congress's laws (including § 3553(a)), or when a court's attempts to apply sentencing law yield a result outside the realm of the reasonable. *See, e.g., Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). [11]

> [11]  So, for example, we suspect it will be a good deal harder for a judge striving to follow § 3553(a) to sustain a sincere judgment that zero years provides "sufficient, but not greater than necessary" punishment for an underlying offense when the § 924(c) gun sentence is 5 years— as in our colleague's hypothetical example—than when it's the 35 years Mr. Smith faces or still longer terms defendants in other cases have confronted. *See* Dissent at 1194. And on appellate review, such a judgment (whether sincere or not) might again be harder to sustain.

Worries that district courts might abuse the discretion afforded them by law may be reason enough to permit appellate review, but they aren't reason enough to withdraw that discretion in defiance of the plain text of the relevant statutory authorities. Maybe we can debate whether in other areas the law is or should be written with an eye to the likely reaction of the "bad man." *Compare* Oliver Wendell Holmes, Jr., *The Path of the Law,* 10 Harv. L.Rev. 457, 459–61 (1897) (suggesting yes), *with* H.L.A. Hart, *The Concept of Law* (3d ed.2012) (suggesting no). But surely we have not yet arrived at the day when appellate judges feel the need to adorn sentencing statutes with new language of their own hand out of concern for the "bad district judge." [12]



do little to address the perceived problem. A "bad judge," after all, could just as easily reduce the sentence for an underlying crime out of sheer dislike of § 924(c)—or for any number of impermissible reasons—all while insisting on the record that his decision was influenced only by lawful factors.

\*

At the end of this long road, it is apparent to us that nothing in current law prohibits a district court's considering a § 924(c) conviction and sentence when seeking to assign a just punishment for a related crime of violence. Sentencing in this context may proceed just as it does elsewhere, with a humble recognition that "no more difficult task confronts judges than the determination of punishment" and "[e]ven the most self-assured judge may well want to bring to his aid every consideration that counsel for the accused can appropriately urge." *Carter v. Illinois,* 329 U.S. 173, 178, 67 S.Ct. 216, 91 L.Ed. 172 (1946).[13] *1194

13   There remains one final matter we must address. Mr. Smith also argues the district court erred by admitting testimony from a forensic firearm and toolmark examiner. Firearm toolmark analysis has recently come under attack for depending on subjective judgment, rarely using control weapons, and risking an observer effect. *See, e.g., United States v. Taylor,* 663 F.Supp.2d 1170, 1179 (D.N.M.2009); *United States v. Green,* 405 F.Supp.2d 104, 119–23 (D.Mass.2005); *see also* Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 150–55 (2009). The problem is, Mr. Smith made plain at oral argument that he doesn't challenge the expert's admission in this case on substantive grounds: he argues only that the district court should have held a hearing before allowing his testimony rather than inviting the parties' submissions on paper. But Mr. Smith identifies no evidence or argument he wanted to place before the court in person that he wasn't able to put forth on paper. If the district court erred at all, then, Mr. Smith gives us no reason to think the error was anything but harmless. And we won't require a new proceeding in the district court when there's so little reason to doubt "the existing one reached the right result." *StorageCraft Tech. Corp. v. Kirby,* 744 F.3d 1183, 1191 (10th Cir.2014); *see also Kinser v. Gehl Co.,* 184 F.3d 1259, 1271–72 (10th Cir.1999), *abrogated in part on other grounds by Weisgram v. Marley Co.,* 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

The conviction is affirmed but the case is remanded for resentencing consistent with the terms of this opinion. **LUCERO, Circuit Judge, concurring in part, dissenting in part.**

My colleagues ask: "Must a sentencing court studiously ignore one of the most conspicuous facts about a defendant when deciding how long he should spend in prison?" (Majority Op. 1180.) That might be an interesting question to address, but as I see it, the real question presented in this appeal is whether the plain language of 18 U.S.C. § 924(c) allows a trial court to reduce a defendant's sentence for an underlying crime of violence based on concerns that the statutorily prescribed § 924(c) sentence is too harsh. Because Congress has mandated that § 924(c) sentences be imposed "in addition to" the sentence for an underlying crime of violence, I would answer that question in the negative.

Consider a district court judge who, after weighing the factors set forth in § 3553(a), determines that a defendant convicted of robbery should be sentenced to five years' imprisonment. Upon ar~~nouncing his intent to impose the sentence~~, the prosecutor interjects that the defendant has ⬛ Download   ⚑ Check if overturned ‖ in relation to a crime of violence under § 924(c), which carries a five-year minimum. The judge

the robbery sentence, the district court revises the robbery sentence down to zero.

Under these circumstances, no one would describe the § 924(c) sentence as having been imposed "in addition to" the robbery sentence, as § 924(c)(1)(A) requires. Nonetheless, the majority concludes that this type of procedure would not violate the text of § 924(c). Because the unambiguous statutory language precludes such a result, I respectfully dissent.

Mandatory minimum sentences contained in § 924(c) have been described as "extremely severe," *United States v. T.M.*, 413 F.3d 420, 426 (4th Cir.2005), "draconian," *United States v. Hebert*, 131 F.3d 514, 526 (5th Cir.1997) (DeMoss, J., dissenting in part), and "unjust, cruel, and irrational," *United States v. Angelos*, 345 F.Supp.2d 1227, 1263 (D.Utah 2004). It is difficult to quibble with these statements. The Judicial Conference of the United States, the U.S. Sentencing Commission, and the American Bar Association have all urged Congress to reconsider the prudence of lengthy mandatory minimums. *See United States v. Bowen*, No. CR–10–204, 2012 U.S. Dist. LEXIS 50670, at *24–44 (E.D.La. Apr. 11, 2012) (unpublished) (collecting commentary).

Despite the problems with § 924(c), "[i]t is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *First Nat'l Bank v. Woods (In re Woods)*, 743 F.3d 689, 694 (10th Cir.2014) (quotation omitted). Mandatory minimums in § 924(c)(1)(A) must be imposed "in addition to the punishment provided for [an underlying] crime of violence or drug trafficking crime," § 924(c)(1)(A), and "[n]otwithstanding any other provision of law," may not "run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or 1195 drug trafficking crime during which the firearm *1195 was used, carried, or possessed," § 924(c)(1)(D).

As the foregoing hypothetical illustrates, accepting Smith's argument would permit district courts to reduce or even replace an otherwise proper sentence for an underlying crime of violence based on the court's concern that the mandatory minimum is excessive. I agree with the vast majority of circuits to have considered this issue that such a procedure violates the unambiguous command that § 924(c) sentences be imposed "in addition to" the sentence for an underlying crime of violence. *See United States v. Chavez*, 549 F.3d 119, 135 (2d Cir.2008) ("[A] sentencing court is required to determine the appropriate prison term for the count to which the § 924(c) punishment is to be consecutive; and if the court reduces the prison term imposed for that underlying count on the ground that the total sentence is, in the court's view, too severe, the court conflates the two punishments and thwarts the will of Congress that the punishment imposed for violating § 924(c) be 'addition [al]' and 'no[t] ... concurrent[ ].' "); *United States v. Hatcher*, 501 F.3d 931, 933 (8th Cir.2007) (sentencing court could not permissibly "conflate [ ] the sentences for the § 924(c) offenses and the related [underlying] crimes"); *United States v. Franklin*, 499 F.3d 578, 583 (6th Cir.2007) ( "This statutory language reflects the intent of Congress that the § 924(c)(1) sentence must be imposed 'in addition to' a reasonable guideline range sentence."); *United States v. Roberson*, 474 F.3d 432, 436 (7th Cir.2007) ("[T]o use the presence of a section 924(c)(1) add-on to reduce the defendant's sentence for the underlying crime would be inconsistent with Congress's determination to fix a minimum sentence for using a firearm in [the underlying crime].") *see also United States v. Powell*, 444 Fed.Appx. 517, 522 (3  ▣ Download   ⚑ Check if overturned   roperly refused to give any weight to the severity of the statutory minimum sentences for the § 924(c) counts

first sentenced for the underlying drug trafficking offense, without consideration for the applicable consecutive sentences related to the firearm violations."). *But see United States v. Webster,* 54 F.3d 1, 4 (1st Cir.1995) ("[I]n departing from a guideline sentence the district court is free to exercise its own judgment as to the pertinence, if any, of a related mandatory consecutive sentence.").

The majority cites to §§ 3553 and 3661, which set the general sentencing policies district courts must follow. (Majority Op. 1181–84.) I agree that § 924(c) strays from these general policies, and from our history of individualized judicial sentencing practices. (See Majority Op. 1181–82.) But "specific statutory provisions prevail over more general provisions." *United States v. Burke,* 633 F.3d 984, 989 (10th Cir.2011) (quotation omitted). And Congress may impinge upon judicial discretion by setting mandatory minimums. *See United States v. Hatch,* 925 F.2d 362, 363 (10th Cir.1991).

In addition to the general statutory provisions, the majority relies on 18 U.S.C. § 1028A, another mandatory minimum that includes language similar to § 924(c), but adds the proviso that "a court shall not in any way reduce the term to be imposed for [an underlying] crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section." § 1028A(b)(3). If the "in addition to" language contained in both § 924(c) and § 1028A were enough, the 1196 majority concludes, this latter proviso would be superfluous. (Majority Op. *1196 1186–87.) But Congress may include technically unnecessary language out of an abundance of caution under the canon *ex abundanti cautela. See Marx v. Gen. Revenue Corp.,* 668 F.3d 1174, 1183 (10th Cir.2011). Indeed, the legislative history of § 1028A indicates that Congress directed the mandatory minimum to be imposed "in addition to any term of imprisonment for the underlying offense," and included subsection (b)(3) "to ensure the intent of th[e] legislation is carried out." H.R.Rep. No. 108–528, at 10 (2004), *reprinted in* 2004 U.S.C.C.A.N. 779, 785–86. That Congress chose a belt-and-suspenders approach in one statute does not render suspenders alone insufficient.

Finally, the majority cites to a Guidelines application note, U.S.S.G. § 2K2.4, cmt. n.4, which provides that a sentencing enhancement for using a firearm should not be applied to an underlying crime of violence if the defendant is also convicted under § 924(c). ( *See* Majority Op. 1187–88.) [1] Whether this note is consistent with the statute is a reasonable question, but not one before us. It may be that the application note permissibly allows for consideration of a § 924(c)*conviction* rather than a § 924(c)*sentence* given that its treatment of the enhancement does not vary based on which of § 924(c)'s several mandatory minimum sentences applies. In any event, a Guidelines application note cannot trump plain statutory language. *See Dorsey v. United States,* —— U.S. ——, 132 S.Ct. 2321, 2327, 183 L.Ed.2d 250 (2012).

---

[1] The availability of this enhancement for an underlying crime of violence absent a § 924(c) conviction explains most of the cases discussing the legal relatedness of the two charges. ( *See* Majority Op. 1189 & n. 6.) These cases concern resentencing for defendants whose § 924(c) convictions were vacated. *See, e.g., United States v. Mendoza,* 118 F.3d 707, 710 (10th Cir.1997). *But see United States v. Watkins,* 147 F.3d 1294, 1296–97 (11th Cir.1998) (holding that the availability of the § 2D1.1(b)(1) enhancement is not "an integral component of the court's jurisdiction to resentence on unchallenged counts" after a § 924(c) conviction is vacated).

Download    Check if overturned

crimes. The plain language of the statute, however, compels me to respectfully dissent.

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Pricing

Switch

Big firm

Coverage

SmartCite

Public records

Partnerships and Resources

Law school

Bar associations

About us

Jobs

Blog

Podcast

News

Twitter

Facebook

LinkedIn

Instagram

Help articles

Customer support

Contact sales

♥ Recommend

Privacy

Terms

© 2019 Casetext Inc.

Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

Download | 🏳 Check if overturned

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELWARE

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Docket No.: 2:17-CR-00197-001 |
| | : | |
| RICHARD BOYLE | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served this day via

first-class mail and/or hand delivery upon the following:

Honorable Gene E. K. Pratter
601 Market Street
Philadelphia, PA 19107


Robert Livermore
U.S. Attorney
Chestnut Street
Philadelphia, PA 19107


DATE: __December 20, 2019__          By: s/ *Nino V. Tinari*

NINO V. TINARI, ESQUIRE
Attorney for Defendant
1528 Walnut St, Suite 1212
Philadelphia, PA 19102
T: 215-790-4010/ F: 215-790-4002
Email: nino@ntinarilaw.com